SLOAN FINANCIAL GROUP, INC., SLOAN HOLDINGS, INC., NEW AFRICA MANAGE-
MENT, LLC, NEW AFRICA INVESTMENT MANAGEMENT, LLC AND NEW AFRICA
ADVISERS, INC., PLAINTIFFS AND CROSS-CLAIM DEFENDANTS, NEW AFRICA OPPOR-
TUNITY FUND, L.P., D/B/A ZM AFRICA INVESTMENT FUND, L.P., PLAINTIFF-
INTERVENOR AND CROSS-CLAIMANT v. JUSTIN F. BECKETT, DORIKA MAMBOLEO,
MICHAEL SUDARKASA, TERESA CLARKE, MACEO K. SLOAN, AND JOHN DOES
(1-10), DEFENDANTS

No. COA02-396

(Filed 5 August 2003)

1. **Arbitration and Mediation— agreement to arbitrate—
scope of agreement—analysis**

The trial court's denial of a motion to compel arbitration
was not reversed based on a failure to follow the Federal
Arbitration Act in an investment fraud case involving multiple
organizational layers, with a question as to whether the arbitra-
tion agreement applied to more than one partnership. North
Carolina's stance on arbitration is very close, if not identical to
the federal stance; under either analysis, a party is first found to
have contractually agreed to arbitration, and then the determina-
tion is whether the dispute falls within the realm of the arbitra-
tion clause. The presumption in favor of arbitration is applied in
the second step.

2. **Arbitration and Mediation— multilayered investment
fraud—relationship of allegations to agreement**

The trial court did not err by finding that all but one claim
arising from investment fraud fell outside an arbitration clause.
The action involved defendants' multilayered organizational
structure, with the question being whether the arbitration agree-
ment for one partnership (NAIM) controlled the other organiza-
tional levels because NAIM was central to the scheme to siphon
money away from the investment fund. The focus of the case is
on the powers granted to another partnership (except for one
claim), and the allegations do not bear a significant or strong
relationship to NAIM's operating agreement and its arbitration
clause.

3. **Arbitration and Mediation— stay of claims not arbi-
trated—denied—no abuse of discretion**

The trial court did not abuse its discretion by not staying
claims not ordered to arbitration. The interest of efficiency

would not be served by holding the main portion of a lawsuit while a side item is arbitrated.

Judge WYNN dissenting.

Appeal by defendants Justin F. Beckett and Dorika Mamboleo from order entered 27 November 2001 by Judge Giles R. Clark in Durham County Superior Court. Heard in the Court of Appeals 27 January 2003.

> *Thelen Reid & Priest, LLP, by Mark Fox Evens; and Brown & Bunch, PLLC, by LeAnn Nease Brown, for plaintiff appellees and defendant appellee Maceo K. Sloan.*

> *Wilmer, Cutler & Pickering, by Brigida Benitez and Rachael A. Hill; Jordan Price Wall Gray Jones & Carlton, by Henry W. Jones, Jr., Hope Derby Carmichael, and Paul T. Flick, for plaintiff appellee-intervenor.*

> *Everett, Gaskins, Hancock & Stevens, LLP, by E.D. Gaskins, Jr., and Michael J. Tadych; Pillsbury Winthrop, LLP, by Richard H. Block and David R. Lagasse, for defendant appellants.*

McCULLOUGH, Judge.

This case arises out of a complex set of facts surrounding the formation and alleged mismanagement of an international private equity investment fund.

Maceo K. Sloan (Sloan), a vice president with North Carolina Mutual Life, formed NCM Capital, a wholly owned subsidiary of North Carolina Mutual, as a vehicle for the company to make investments. In 1991, North Carolina Mutual Life wanted to sell off some of its assets, so Sloan formed Sloan Financial Group, Inc. (SFG-N.C. Corporation), which purchased NCM Capital from North Carolina Mutual Life. Under Sloan's leadership, SFG became the largest African-American owned investment company in the United States, managing over $3 billion by 1994. Sloan became chief executive officer (CEO) of Sloan Financial Group. Prior to the formation of SFG, Sloan had met Justin Beckett, and was impressed by his "drive and determination." Sloan hired him and Beckett rose to become the executive vice president and a director of SFG, as well as its second largest shareholder.

Beckett was interested in developing business opportunities in southern Africa once sanctions associated with apartheid had lifted.

He convinced SFG to allow him to oversee investment there. As such, SFG formed New Africa Advisers, Inc. (NAA-Delaware Corporation), for this purpose and Beckett served as CEO and had day-to-day control. NAA traded securities on African stock exchanges.

Next, Beckett proposed that SFG create a private equity fund in southern Africa. Such a fund would act as a venture capital investment fund to make direct investments in the Republic of South Africa and surrounding countries, with Beckett at the helm as manager. This was about 1995.

SFG agreed to the proposal. SFG submitted its proposal, drafted by Beckett, of the multi-million dollar private equity fund to the Overseas Private Investment Corporation (OPIC), an agency of the United States government that funds foreign investment. OPIC was to make an $80 million investment and a group of limited partners would provide capital contributions in the amount of $40 million. OPIC approved the $120 million plan on 4 September 1996, and began work with Beckett to draft the documents of the fund that was to be known as the New Africa Opportunity Fund (NAOF, the Fund-Delaware Limited Partnership).

In addition, Beckett had to find the limited partners willing to invest the $40 million. Sloan, who said in the complaint that he "has a personal commitment to Africa," assisted Beckett in obtaining limited partners. Together they secured Citicorp, Sun America, Inc., Northwestern Mutual Life Insurance Co., Burden & Co., Waycrosse, Inc., Challenger Capital Management, L.P., Allbrook International, NAF Investment, LLC, and Chancellor Corp. These limited partners and OPIC agreed to back the Fund largely because of the proposed purposes and objectives set forth in the 15 August 1997 Confidential Private Placement Memorandum (PPM). The PPM made Beckett responsible for management. The personal involvement of Beckett, Sloan and SFG was integral in getting investors on board with the project.

The documents for NAOF were soon after completed. Most notable was the Amended and Restated Agreement of Limited Partnership Agreement (partnership agreement) and a Finance Agreement, both dated 15 August 1997. Together with the PPM, the partnership agreement, the Finance Agreement, the commitment and subscriptions of the limited partners formed the NAOF documents that created the Fund and structured its management.

Pursuant to these documents, New Africa Investment Management (NAIM-Delaware Limited Liability Company) was formed by SFG. NAIM was installed as the general partner to NAOF as per the partnership agreement. This was its sole purpose. The members involved with NAIM executed a Limited Liability Company Agreement on 15 August 1997. This agreement was made to deal with the creation and inner workings of NAIM. Beckett was the president and manager of NAIM, while Sloan was the vice president, and defendants Mamboleo and Clarke served as members of NAIM.

NAIM was authorized to, among other things, invest the funds of the Fund on the advice of the Investment Committee headed by Sloan, monitor the investments of the Fund, enter into a Finance Agreement with OPIC, maintain the bank accounts of the Fund, make payments on behalf of the Fund, enter into a Management Agreement, and take other actions necessary or convenient to transact the Fund's business by the partnership agreement of NAOF. An advisory board was also created by the partnership agreement, which included representatives from the limited partners and OPIC that served to review transactions that had potential conflicts of interest.

Sloan Holdings, Inc. (SHI-Delaware Corporation) was formed shortly prior to NAIM by Sloan and Beckett to be the only managing member of NAIM. This was its sole purpose. SHI held the majority stake in NAIM. Sloan served as chairman and CEO and owned two-thirds of the equity in SHI, and Beckett was the president, the manager, and owned the remaining equity.

Sloan executed the partnership agreement, which created the Fund, on behalf of SHI as managing member of NAIM, the partnership's general partner.

New Africa Management, LLC (NAM-Delaware LLC) was formed by SHI, which wholly owned NAM, to be the manager of the Fund and oversee its investments. This was its sole purpose. SHI installed Beckett as president and CEO of NAM. On 15 August 1997, NAIM entered into a "management agreement" with NAM on behalf of the Fund. Under this agreement, NAM was to provide management services for the Fund for a management fee. Under this management agreement, NAM had duties involving locating potential investments and monitoring the Fund.

All this was done in accordance with the documents involved in the formation of the Fund. To recap, SHI was formed to be the man-

SLOAN FIN. GRP., INC. v. BECKETT

[159 N.C. App. 470 (2003)]

aging member of NAIM, which was formed soon after SHI to be the general partner of the Fund. SHI also formed NAM to be the manager of the Fund.

Beckett had substantial control over the Fund by virtue of his positions in the foregoing entities. He formed a team of advisors that included most of the named defendants. With his personnel in place, it is alleged that he proceeded to ignore Fund guidelines and allegedly misappropriate Fund money. They allegedly falsified information to OPIC and the rest of the overseeing bodies to make these investments appear to be valid. Excessive spending and salaries were implemented. The management fees that were supposed to go to respective plaintiffs were siphoned into this group's possession.

In addition to mismanagement, Beckett and other defendants allegedly devised another way to steal from the Fund. Beckett formed New Africa Finance Corporation (NAFC—formed in the African nation of Mauritius) under the guise that it would become a portfolio company in early 1999. Under normal operation, the Fund was not to be involved with the day-to-day operations of portfolio companies. However, with NAFC in place, Beckett could exploit portfolio companies in this manner as well. These companies had to keep funding to stay alive, so Beckett allegedly made them pay NAFC for excessive consulting and financing fees to stay within his good graces. Beckett thereby allegedly extorted large amounts of money from portfolio companies in this manner.

Eventually, in July of 2000, all this came to light and Beckett was forced to resign by agreement on 14 August 2000 and his supposed accomplices were terminated. NAA suffered annual losses in excess of $1.5 million. NAIM was removed as general partner of the Fund on 20 September 2000. NAM lost an opportunity to manage another newly created but similar larger fund. The reputation of NAM was tarnished and it was removed as manager of NAOF. SHI lost the benefit of managing NAIM.

As a result of this, SFG, SHI, NAM, NAIM, and NAA filed suit on 26 February 2001 against Justin Beckett, his wife and fellow employee Dorika Mamboleo, Michael Sudarkasa, Teresa Clarke, and other unnamed defendants. There were several counts in this complaint: Fraud as to all defendants in the formation of NAFC; conversion/embezzlement as to all defendants by misappropriating management fees; conspiracy as to all defendants; tortious interference with prospective economic advantage as to Beckett; breach of fidu-

ciary duty as to Beckett (officer and president of NAM, president and member of NAIM, director, president and CEO of NAA) and Sudarkasa (chief operations officer of NAA); breach of contract as to Beckett and Mamboleo by failing to comply with the NAIM operating agreement; unfair and deceptive trade practices as to all defendants; breach of employment agreement as to Beckett with NAM by forming NAFC; in the alternative breach of contract as to Beckett in the Separation Agreement and General Release (14 August 2000 contract); fraud in the inducement to contract as to Beckett and the 14 August 2000 contract; punitive damages as to all defendants; and an accounting.

The Fund successfully intervened in this lawsuit by order of the trial court on 30 May 2001. The Fund filed its complaint in the matter on 1 June 2001. This complaint added Sloan as a defendant and included him as being at least somewhat involved in the malfeasance surrounding the Fund, as well as including plaintiffs from the original complaint as defendants. This complaint had several counts: Fraud as to Beckett, Sudarkasa, NAIM and NAM by their involvement with NAFC; unfair and deceptive trade practices as to the same; breach of contract as to NAIM as per the partnership agreement; breach of fiduciary duty as to Beckett and NAIM because they defrauded the Fund; breach of fiduciary duty as to SFG and Sloan as they staffed all the corporations and should have known about the malfeasance; breach of contract as to Beckett as he had a contract with NAM to manage the Fund; breach of contract as to Beckett and Mamboleo as they were members of NAIM and parties to its operating agreement; aiding and abetting breach of fiduciary duty as to Sudarkasa, Mamboleo, and Clarke because they helped Beckett with NAFC; gross negligence as to SFG, NAIM, NAM, Beckett, and Sloan for lack of supervision; vicarious liability as to SFG; constructive trust as to all involved for money belonging to the Fund; and unjust enrichment as to NAM for management fees paid.

On 29 August 2001, the Fund filed an amended complaint, which removed the cause of action for breach of contract as to Beckett and Mamboleo as they were members of NAIM and parties to its operating agreement from the complaint.

After these respective pleadings, defendants Beckett and Mamboleo made motions to compel the matter to arbitration. They based this motion on the NAIM operating agreement, which provided the following provision:

SECTION 10.1. <u>Arbitration; Waiver of Partition/Action for Accounting</u>. (a) To the fullest extent permitted by law, any dispute, controversy or claim arising out of or relating to this Agreement or to the Company's affairs or the rights or interests of the Members including, but not limited to, the validity, interpretation, performance, breach or termination of this Agreement, whether arising during the Company term or at or after its termination or during or after the liquidation of the Company, shall be settled by arbitration in New York City by three neutral arbitrators in accordance with the rules then obtaining of the American Arbitration Association.

It was defendants' contention that all parties should be compelled to arbitration on the basis of this provision. According to defendants' argument, the Fund was created by its partnership agreement. That partnership agreement put the operations and control of the Fund in the management of the general partner, which was NAIM. Backing up, SHI was formed to be NAIM's managing member, solely responsible for its management, as NAIM was a limited liability company. SHI was thus NAIM's agent. SHI signed and executed the operating agreement that created NAIM and gave it management power over NAIM. This was the document that contains the arbitration clause, quoted above. In addition, NAM, the manager of the fund, was directed by NAIM. Therefore, the operating agreement and NAIM, according to the original defendants, are at the heart of the matter. All funds flowed through it to the Fund. Defendant Beckett was the president of NAIM, which was in sole control of the operations of the Fund. Whatever wrongdoing was done with Fund monies, it was done via defendants' positions with NAIM and its affairs. Therefore, defendants argued the arbitration provision was binding on all parties.

The trial court did not agree with their argument, however, ruling for plaintiffs and intervenor that, with the exception of one cause of action by plaintiffs (Count VI, breach of NAIM Operating Agreement by Beckett and Mamboleo), all other claims by plaintiffs and all claims by intervenor fell outside the scope of the arbitration clause found in the NAIM operating agreement. The trial court stayed the litigation of Count VI pursuant to the Federal Arbitration Act, 9 U.S.C. § 3. The trial court denied defendants' motion to stay the litigation of all claims pending the arbitration of Count VI. Defendants appeal. After filing this notice of appeal, the appellees filed a motion to stay all proceedings pending the outcome of the present appeal. This motion was granted on 22 February 2002.

Defendants assign as error: The trial court's denial of defendants Beckett and Mamboleo's (I) Motion to Compel Arbitration as to the complaint of plaintiff-intervenor and Counts I-V and VII-XI of the complaint of plaintiffs; (II) request for a stay of litigation as to the claims of plaintiff-intervenor and the claims contained in Counts I-V and VII-XI of the complaint of plaintiffs.

I.

[1] Initially, defendant appellants (Beckett & Mamboleo) contend that the trial court failed to apply the Federal Arbitration Act (FAA). 9 U.S.C. §§ 1, *et. seq.* The FAA, according to appellants, demands interpretation of an arbitration clause in light of the federal policy favoring arbitration. *See Moses H. Cone Hospital v. Mercury Constr.*, 460 U.S. 1, 24-25, 74 L. Ed. 2d 765, 785 (1983) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]"); *United Steelworkers v. Warrior & G. Nav. Co.*, 363 U.S. 574, 582-83, 4 L. Ed. 2d 1409, 1417 (1960) ("An order to arbitrate . . . should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."). Instead, the trial court applied what appellants characterize as a "mistakenly narrow view of arbitration."

Appellees (Sloan and the Companies) point out that appellants did not raise the FAA issue at trial and gave no facts to support a finding that the operating agreement "evidenc[es] a transaction involving commerce[.]" *See Porter Hayden Co. v. Century Indem. Co.*, 136 F.3d 380, 382 (4th Cir. 1988) (scope of arbitration clause governed by FAA because the agreement "evidenc[ed] a transaction involving commerce"). All appellees agree that the trial court used the proper standard considering appellants' motion.

Our review of the trial court's order is *de novo*, whether the trial court employed the FAA or our state's law construing arbitration clauses. *See Tohato, Inc. v. Pinewild Management, Inc.*, 128 N.C. App. 386, 391-92, 496 S.E.2d 800, 804 (1998). In any event, it appears that North Carolina's stance on arbitration is very close, if not identical, to the federal stance. Recently, this Court stated:

As a general matter, public policy favors arbitration. *See, e.g., Moses H. Cone Hospital v. Mercury Constr.*, 460 U.S. 1, 74 L. Ed. 2d 765 (1983) (ambiguities or doubts as to the scope of arbitrable disputes are to be resolved in favor of arbitration);

*Johnston County v. R.N. Rouse & Co.*, 331 N.C. 88, 91, 414 S.E.2d 30, 32 (1992) (noting North Carolina's "strong public policy" in favor of resolving disputes by arbitration). However, before a dispute can be ordered resolved through arbitration, there must be a valid agreement to arbitrate. *United Steelworkers v. Warrior & G. Nav. Co.*, 363 U.S. 574, 4 L. Ed. 2d 1409 (1960); *LSB Financial Services, Inc. v. Harrison*, 144 N.C. App. 542, 548 S.E.2d 574 (2001). Thus, whether a dispute is subject to arbitration is a matter of contract law. *Ragan v. Wheat First Sec., Inc.*, 138 N.C. App. 453, 531 S.E.2d 874, *disc. review denied*, 353 N.C. 268, 546 S.E.2d 129 (2000). Parties to an arbitration must specify clearly the scope and terms of their agreement to arbitrate. *Futrelle v. Duke University*, 127 N.C. App. 244, 488 S.E.2d 635, *disc. review denied*, 347 N.C. 398, 494 S.E.2d 412 (1997). *See also Ruffin Woody and Associates v. Person County*, 92 N.C. App. 129, 374 S.E.2d 165 (1988), *disc. review denied*, 324 N.C. 337, 378 S.E.2d 799 (1989) (court holds that dispute concerning architect's performance is within arbitration clause in construction contract, stating that determination of arbitrability of specific claim is governed by language of parties' contract). Moreover, a party cannot be forced to submit to arbitration of any dispute unless he has agreed to do so. *AT&T Technologies v. Communications Workers*, 475 U.S. 643, 89 L. Ed. 2d 648 (1986) (citation omitted). *See also United Steelworkers*, 363 U.S. 574, 4 L. Ed. 2d 1409; *LSB Financial Services*, 144 N.C. App. 542, 548 S.E.2d 574 (court finds that securities transaction dispute is subject to arbitration clause, noting that arbitration is required only when parties have previously agreed to submit dispute to arbitration); *Rodgers Builders v. McQueen*, 76 N.C. App. 16, 331 S.E.2d 726 (1985), *disc. review denied*, 315 N.C. 590, 341 S.E.2d 29 (1986).

The question of whether a dispute is subject to arbitration is an issue for judicial determination. *AT&T Technologies*, 475 U.S. 643, 89 L. Ed. 2d 648. The trial court's conclusion as to whether a particular dispute is subject to arbitration is a conclusion of law, reviewable *de novo* by the appellate court. *Tohato, Inc. v. Pinewild Management, Inc.*, 128 N.C. App. 386, 496 S.E.2d 800 (1998). Whether a dispute is subject to arbitration involves a two pronged analysis; the court must ascertain both (1) whether the parties had a valid agreement to arbitrate, and also (2) whether "the specific dispute falls within the substantive scope of that agreement." *PaineWebber Inc. v. Hartmann*, 921 F.2d 507, 511 (3d Cir. 1990). This Court has adopted the *PaineWebber* analysis.

> *Ragan,* 138 N.C. App. 453, 531 S.E.2d 874 (in considering a motion to compel arbitration, the trial court should determine the validity of the contract to arbitrate, and whether the subject matter of the arbitration agreement covers the matter in dispute); *Rodgers Builders,* 76 N.C. App. 16, 331 S.E.2d 726 (arbitrability is determined by relationship between claim and subject matter of arbitration clause).

*Raspet v. Buck,* 147 N.C. App. 133, 135-36, 554 S.E.2d 676, 678 (2001).

Under either analysis, once a party has been found to have contractually agreed to arbitration, what is left to determine is whether the claim or dispute between the parties falls within the realm of, or has a significant or strong relationship with, the agreed upon arbitration clause. *See American Recovery v. Computerized Thermal Imaging,* 96 F.3d 88, 93 (4th Cir. 1996); *Rodgers Builders v. McQueen,* 76 N.C. App. 16, 24, 331 S.E.2d 726, 731 (1985), *disc. review denied,* 315 N.C. 590, 314 S.E.2d 29 (1986). It is in this second step of either analysis where the presumption in favor of arbitration exists. *See Fleetwood Enterprises, Inc. v. Gaskamp,* 280 F.3d 1069, 1073 (5th Cir. 2002).

Therefore, we decline to reverse the trial court's ruling on the basis that it may not have followed the FAA.

## II.

**[2]** Appellants contend that the trial court erred by finding that all the claims, save the one, by both appellees fell outside of the scope of the arbitration clause and denying its motion to compel. The clause at issue, which comes from the operating agreement of NAIM, is restated here in pertinent part:

> To the fullest extent permitted by law, any dispute, controversy or claim arising out of or relating to this Agreement or to the Company's affairs or the rights or interests of the Members including, but not limited to, the validity, interpretation, performance, breach or termination of this Agreement . . . shall be settled by arbitration . . . .

Beckett was a member of NAIM, as well as its president and general manager. Ms. Mamboleo was a member of NAIM.

Appellants' argument is twofold as it pertains to two different groups of appellees: (A) NAIM and SHI, the so-called signatories to

the NAIM operating agreement; and (B) SFG, NAM, NAA, and NAOF (the Fund), the so-called non-signatories.

## A.

Appellants contend that NAIM and SHI are bound by the NAIM operating agreement and should have been compelled to arbitration per their motion before the trial court.

As stated above, the two-step analysis in considering a motion to compel parties to arbitration involves determining whether a valid agreement to arbitrate existed between the parties, and then whether or not the claims are embraced by that agreement.

Appellants' argument is generally straightforward. The operating agreement creates NAIM, and thus it is bound by the agreement. For argument's sake, we will assume this proposition. SHI was made the managing member by the operating agreement and signed it, making it bound. Beckett signed the agreement as an original member, and Mamboleo apparently became a member, making them bound. Further, Sloan signed individually as a member and for SHI.

As to the relationship of the bound signatories' complaint to the arbitration clause, appellants point to:

Count I— The fraud claim for the misrepresentation by Beckett and Mamboleo that NAFC was actually an investment banking company, causing SFG to authorize Fund money to NAFC.

Count III— The conspiracy claim against Beckett and Mamboleo for the plan to misappropriate funds of NAIM and SHI.

Count IV— The breach of fiduciary duty claim against Beckett as, among others, president and member of NAIM.

Count VII— The Unfair and Deceptive Trade Practice claim against Beckett and Mamboleo for establishing NAFC to siphon money from the Fund.

Count IX— The breach of contract claim against Beckett for violating the release he signed when he left the Sloan companies' employ.

Count X— The fraud in the inducement to contract against Beckett for the release.

Count XI— The punitive damages and accounting claims against Beckett and Mamboleo for all the fraud and conspiracy allegations.

According to appellants, all of these claims "arise out of or relate to" the NAIM operating agreement. This is because it is appellants' theory that NAIM was the central piece in this alleged scheme to siphon money out of the Fund as it stands at the center of the Fund's management. NAIM controlled the flow of dollars through the Fund, and Beckett is alleged to have used his position at NAIM to accomplish these deeds.

Appellees (Sloan and the Companies) counter appellants' NAIM-central theory by drawing a different picture that has NAFC at the heart of the dispute. According to Sloan and the Companies, the NAIM operating agreement was an internal agreement governing the conduct of its members, and its purpose was limited as such:

> The parties wish to enter into this Limited Liability Company Agreement to (a) reflect the admission of persons as members and (b) make certain provisions for the affairs of the Company and the conduct of business.

The operating agreement dealt with the formation of NAIM, the duties of the managing member (SHI), indemnification among the members, contributions by and distributions to members, procedures in the event of dissolution; transfer of a member's interest, etc. The only real mention of the Fund came in Article II, Section 2.6, under the purpose and powers provision:

> The purpose of the [NAIM] shall be (i) to serve as, and perform the functions required of, the general partner of the Fund and to make capital contributions thereto, and (ii) to do all things necessary or incidental thereto, provided that the Company shall not undertake any activities unrelated to its obligations, duties and activities as general partner of the Fund as provided in the Fund Partnership Agreement . . . .

Appellees (Sloan and the Companies) propose this Court read the arbitration clause and interpret the phrase "arising out of or relating to this Agreement or to [NAIM's] affairs or the rights or interests of the Members" in a narrow sense, only dealing with internal claims dealing with the specific dealings of the agreement. This is the path the trial court apparently took.

Bolstering appellees' view of the NAIM operating agreement is the fact that the operational control of the Fund money stems from the Amended and Restated Agreement of Limited Partnership of New Africa Opportunity Fund (the partnership agreement). They contend that the NAIM agreement may have created the Fund's general partner, but the real story of the matter is the power granted by the partnership agreement.

The partnership agreement, as stated in the facts, was entered into by NAIM as general partner, and by all the limited partners (OPIC, the private corporations). It organized the Fund and set forth its goals in Article 2, Section 2.5:

> (a) to purchase, hold, manage and sell Portfolio Investments for the purpose of realizing gain through capital appreciation;
>
>    . . . .
>
> (c) to conduct ancillary investment activities and all other activities related or incidental to the foregoing.

More importantly, the partnership agreement gave the general partner its powers with respect to the Fund in Article 2, Section 2.6. These powers include:

> (1) to purchase, invest in, hold and sell or otherwise dispose of Portfolio Investments . . . and, in order to ensure that funds will be available when needed to invest in Portfolio Investments, to be applied to the payment of expenses or to be paid in connection with the termination of the Partnership . . . ;
>
> (2) to monitor the performance of Portfolio Investments . . . ;
>
>    . . . .
>
> (4) to form Subsidiaries in connection with the Partnership Business;
>
> (5) to enter into any kind of activity and to enter into, perform and carry out contracts of any kind necessary to, in connection with, or incidental to the accomplishment of the purposes of the Partnership set forth in Section 2.5 hereof, including, without limitation, the Management Agreement;
>
> (6) to open, maintain, and close accounts with brokers . . . which power shall include the authority to issue all instructions

and authorizations to brokers regarding securities and money therein and to pay, or authorize the payment and reimbursement of, brokerage commissions;

(7) to open, maintain and close bank accounts and draw checks or other orders for the payment of monies;

(8) to bring and defend actions and proceedings at law or in equity before any governmental, administrative or other regulatory agency, body or commission;

(9) to purchase, at the expense of the Partnership, liability, casualty and other insurance and bonds to protect the Partnership's properties and operations;

(10) to pay all reasonable fees and expenses of the Partnership; and

(11) to take any and all other actions which are determined by the General Partner to be necessary, convenient or incidental to the conducting of the Partnership Business.

Article 4, Section 4.1 gave NAIM, as general partner, the exclusive right to manage and control the Fund. Other provisions in that article gave NAIM other exclusive powers, such as contract powers.

Appellees maintain that it is these powers that are alleged to have been abused. It was with these powers that Beckett allegedly created NAFC and siphoned money out of the Fund by advising that it would eventually become a portfolio company, all the while draining the Fund of investment capital. Beckett and the others alleged transgressions against the Fund via NAFC are thus not related to the NAIM operating agreement.

The Fund partnership agreement does not exude a preference for arbitration. It contains no such clause. What it does contain is what appears to be a forum selection clause in Article 12, Section 12.8:

Jurisdiction for Disputes. Any dispute, controversy or claim arising out of or relating to this Agreement, or the breach, termination or validity thereof, shall be submitted to a New York State or federal court sitting in the City of New York.

It appears to this Court that appellees are not suing on behalf of the NAIM agreement, except for Claim VI. The position of Beckett at NAIM is indeed key. In addition, the NAIM operating agreement

creating the general partner of the Fund is certainly not merely incidental. However, it is the powers granted by the NAOF partnership agreement that are the true focus. These powers enabled Beckett and Mamboleo to carry out the alleged deeds relating to NAFC, which appears to have been the central instrument of their plot.

While it may be clear that NAIM, SHI, Beckett, Mamboleo, and Sloan are bound to the NAIM operating agreement and thus the arbitration clause, that clause does not encompass the current dispute. In making this determination, we are mindful of the presumption in favor of arbitration. However, we hold that the allegations made in this matter bear no significant or strong relationship to the operating agreement and its arbitration clause. It is unreasonable to compel arbitration in this case on the basis of the NAIM operating agreement and we decline to do so. We therefore affirm the trial court's ruling with respect to these parties. Assignment of error overruled.

B.

Appellants' second contention is that SFG, NAM, NAA, and NAOF (the Fund), the so-called non-signatories, are bound by the arbitration clause found in the NAIM operating agreement. *See E.I. DuPont de Nemours v. Rhone Poulenc Fiber*, 269 F.3d 187, 194 (3d Cir. 2001); *Inter. Paper v. Schwabedissen Maschinen & Anlagen*, 206 F.3d 411, 416-18 (4th Cir. 2000). This argument is tied to the previous argument. We do not address appellants' argument that the non-signatories are obligated to arbitrate due to overlapping ownership and claims and estoppel due to the fact that, even if true, the arbitration clause does not encompass the current dispute as adjudicated by the trial court.

The dissent acknowledges that it is the alleged abuse of the NAOF fund by defendants that led to this lawsuit. The dissent then oversimplifies a rather complex business structure arguing that merely because NAIM was the general partner, the arbitration clause in the NAIM agreement binds all of the NAOF limited partners, whether they signed the NAIM agreement or not, thus, in effect, reaching this issue. Suffice it to say that NAIM had no power to act, except for the NAOF partnership agreement and the powers conferred therein. As it is the alleged abuse of the NAOF delegated powers that is central to the case *sub judice*, we believe the trial court properly ruled the NAIM arbitration clause was not controlling for all but one of the counts of the complaints. This assignment of error is overruled.

SLOAN FIN. GRP., INC. v. BECKETT

[159 N.C. App. 470 (2003)]

## III.

[3] Appellants' final argument is that the trial court erred by failing to stay all claims not ordered to arbitration. The decision to grant or deny a stay rests within the discretion of the trial court, and review of that decision is for abuse of that discretion. *See American Recovery*, 96 F.3d at 96-97.

Appellants ask this Court to stay the majority of the claims in this matter while one claim is dealt with due to the "considerations of judicial economy and avoidance of confusion and possible inconsistent results[.]" *Am. Home Assur. v. Vecco Concrete Const. Etc.*, 629 F.2d 961, 964 (4th Cir. 1980). Appellants also point out that the trial court has twice recognized the interconnectedness of all the claims, once when the trial court allowed the Fund to intervene, and the second time when it stayed all proceedings pending the outcome of this appeal citing the interests of "consistency and efficiency." Appellants now cite the same interests.

We are being asked to stay numerous claims while a single claim goes through arbitration. Admittedly, factual issues overlap. However, we have already held that the NAIM operating agreement, while an important piece of the puzzle, was not the main piece. This position belongs to the Fund and NAFC. The numerous claims appellants wish to have stayed are based upon the powers granted by the Fund's partnership agreement. Thus, we hardly see how the interest of efficiency could be served by forcing the main portion of a lawsuit be put on hold while a side item is arbitrated. We find no abuse of discretion by the trial court in staying the claim that was ordered arbitrated. This assignment of error is overruled.

Affirmed.

Judge ELMORE concurs.

Judge WYNN dissents.

WYNN, Judge dissenting.

In this appeal, defendants Beckett and Mamboleo contend the trial court erred by denying their motion to compel arbitration. Though "mindful of the presumption in favor of arbitration," the majority holds that "[i]t is unreasonable to compel arbitration in this case." As I strongly disagree with the majority's application of the relevant law, I am compelled to respectfully dissent.

Under the Federal Arbitration Act ("FAA"), codified in Title IX of the United States Code,

> A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2 (2002). Our Supreme Court recognized in *Burke County Pub. Sch. Bd. of Educ. v. Shaver Partnership*, 303 N.C. 408, 422, 279 S.E.2d 816, 825 (1981), that "[t]he Federal Arbitration Act, by virtue of the Supremacy Clause [of the United States Constitution], is . . . part of North Carolina law."

The United States Supreme Court has repeatedly emphasized that:

> in enacting § 2 of the [FAA], Congress declared a national policy favoring arbitration and withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration . . . . Section 2 . . . embodies a clear federal policy of requiring arbitration unless the agreement to arbitrate is not part of a contract evidencing interstate commerce or is revocable upon such grounds as exist at law or in equity for the revocation of any contract.

*Perry v. Thomas*, 482 U.S. 483, 489 (1987). *See also Southland Corp. v. Keating*, 465 U.S. 1, 11-12 (1984); *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24 (1983).

As noted by the majority, however, the United States Supreme Court has also held that "[t]he question whether the parties have submitted a particular dispute to arbitration, i.e., the 'question of arbitrability,' is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." *Howsam v. Dean Witter Reynolds*, 537 U.S. 79 (2002) (citations omitted). In *Howsam*, Justice Breyer emphasized, notwithstanding, that the question of arbitrability is only "applicable in the kind of narrow circumstance where contracting parties . . . are not likely to have thought that they had agreed" to arbitrate the matter, and where court action would have the effect of "forcing parties to arbitrate a matter that they may well not have agreed to arbitrate." *Id.*

In this case, neither the majority nor the parties dispute that the contract evidenced a transaction involving commerce. Instead, the

majority holds that the complaint contained counts which, as Section 2 and *Howsam* provide, were not "arising out of such contract or transaction," and, thus, were not arbitrable.

My review of the record, however, indicates that this entire controversy involves the alleged mismanagement of monies flowing into and out of the New Africa Opportunity Fund. The Fund is a limited partnership, with only one general partner: New Africa Investment Management. Defendant Beckett was sued because he was the President, General Manager, and member of New Africa Investment Management. Defendant Mamboleo is a member of New Africa Investment Management. As the New Africa Investment Management agreement contained an express arbitration clause—a clause which extended its reach to "the fullest extent permitted by law"—I do not believe that an order compelling arbitration would force the "parties to arbitrate a matter that they may well not have agreed to arbitrate." *Howsam v. Dean Witter Reynolds*, 537 U.S. 79. As this is the only plausible basis for the majority's holding, I am compelled to respectfully dissent.