Worldwide Ins. Network, Inc. v. Messer Fin. Grp., Inc., 2018 NCBC 102.

STATE OF NORTH CAROLINA

GUILFORD COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18 CVS 4371

WORLDWIDE INSURANCE
NETWORK, INC.,

        Plaintiff,

v.

MESSER FINANCIAL GROUP,
INC.; ROY MESSER; BILL RICE;
MOORE'S FINANCIAL GROUP,
INC. f/k/a ROD MOORE &
ASSOCIATES, LLC; and ROD
MOORE,

        Defendants.

**ORDER AND OPINION ON
DEFENDANTS' MOTION TO STAY
AND COMPEL ARBITRATION**

1.      Plaintiff Worldwide Insurance Network, Inc. ("Worldwide") sells insurance

and other financial products using a network of independent agents.  In this action,

Worldwide has sued some of its former agents, alleging that they conspired to obtain

Worldwide's confidential information and to use that information to compete against

it.  Defendants now ask the Court to compel arbitration of all claims and to stay the

case pending arbitration.  For the following reasons, the Court **GRANTS** the motion

in part and **DENIES** the motion in part.

> *Ellis & Winters LLP, by Christopher W. Jackson, and Taylor English
> Duma LLP, by William A. Clineburg, Jr. and Eric S. Fisher, for Plaintiff
> Worldwide Insurance Network, Inc.*
>
> *Brooks, Pierce, McLendon, Humphrey & Leonard LLP, by Jeffrey E.
> Oleynik, and Baker, Donelson, Bearman, Caldwell & Berkowitz, PC, by
> Brad C. Moody and Lott Warren, for Defendants Messer Financial
> Group, Inc., Roy Messer, Bill Rice, Moore's Financial Group, Inc. f/k/a
> Rod Moore & Associates, LLC, and Rod Moore.*

Conrad, Judge.

## I.
## BACKGROUND[1]

2. Through its Smart Choice® Agent's Program, Worldwide enlists independent insurance agents to sell its products and services to end customers. (Compl. ¶¶ 10, 11, ECF No. 3.) Defendants are all former participants in the program, though with varying degrees of involvement and subject to different contracts, at least three of which are relevant here. (*See* Compl. ¶¶ 14, 15, 18.)

3. Two defendants—Rod Moore and Moore's Financial Group, Inc. (collectively, "Moore Defendants")—are based in Mississippi. (Compl. ¶¶ 5, 6.) It isn't clear from the complaint when the Moore Defendants joined Worldwide's network of agents, but materials filed in support of their motion suggest they became agents in June 2015. (*See* Mot. to File Under Seal Ex. B, ECF No. 41.2.) A few months later, the Moore Defendants agreed to serve as Worldwide's territory manager for Mississippi, taking on the responsibility to recruit and manage other Smart Choice® agents. (*See* Compl. ¶¶ 16, 17.) They formalized the arrangement in a Territory Manager Agreement. (Compl. ¶ 18; *see also* ECF No. 22 ["Territory Manager Agreement"].)

4. The other defendants, all North Carolinians, are Messer Financial Group, Inc. and its two founders, Bill Rice and Roy Messer (collectively, "Messer Defendants"). In November 2015, they entered into a contract to become Smart Choice® agents ("Agent Agreement"). (Compl. ¶¶ 13, 14; *see also* ECF No. 44 ["Agent

---

[1] As context for the Court's analysis, this section describes the allegations in the complaint and also the relevant facts regarding the pending motion, which are largely undisputed (though the parties draw different conclusions from them). The Court elects to make necessary findings of fact and conclusions of law at the end of this Opinion.

Agreement"].)  Then, in early 2016, Messer Financial Group entered into a separate contract ("Referral Agreement") in which it agreed to refer new agents to Worldwide in return for a commission.  (Compl. ¶ 15; *see also* ECF No. 54 ["Referral Agreement"].)

5.    These arrangements were all short lived.  The Moore Defendants resigned as territory manager in April 2016.  (Compl. ¶ 22.)  Worldwide and the Messer Defendants terminated the Agent Agreement and the Referral Agreement in June 2016.  (Compl. ¶ 28.)

6.    Worldwide now alleges that the whole series of events was a sham.  According to the complaint, the Moore Defendants and Messer Defendants had worked together since 2008, yet concealed that fact from Worldwide.  (*See* Compl. ¶ 19.)  When Defendants joined the Smart Choice® Program in 2015, it was allegedly the first step in a conspiracy to obtain Worldwide's confidential information.  (*See* Compl. ¶¶ 19, 20.)  Upon leaving the program, Defendants took the next step and began competing against Worldwide, going so far as to start a new company together to do so.  (*See* Compl. ¶¶ 24, 25, 32, 33–37.)  Worldwide asserts claims for breach of the non-compete, non-solicitation, and confidentiality restrictions in each contract.  (*See* Compl. ¶¶ 42, 48, 54.)  It also asserts a number of non-contract claims, including conspiracy, unjust enrichment, misappropriation of trade secrets, and tortious interference with contract (against only the Messer Defendants).  (Compl. ¶¶ 59, 63– 66, 71, 77.)

7.    Defendants contend that all of these claims are subject to binding arbitration. (*See* Defs.' Mem. in Supp. 3, ECF No. 40 ["Defs.' Mem."].) Each of the three relevant contracts (the Agent Agreement, Referral Agreement, and Territory Manager Agreement) includes an arbitration clause. The Agent Agreement states that "[a]ny dispute, claim or controversy arising from or relating to" the agreement or to the "construction, validity or enforcement" of the agreement shall be arbitrated in accordance with the Commercial Rules of the American Arbitration Association ("AAA Rules"). (Agent Agreement § 11.2.) The clauses contained in the Referral Agreement and the Territory Manager Agreement, though identical to each other, differ in important ways from the language used in the Agent Agreement. These clauses also incorporate the AAA Rules but expressly exclude certain claims from arbitration, stating that no party "will be compelled" to arbitrate disputes involving "actual or threatened disclosure or misuse of confidential information," "a breach of any covenant not to compete," or "a violation of non-solicitation provisions." (Referral Agreement § 10(D); Territory Manager Agreement § 14(D).)

8.    In its opposition brief, Worldwide responds that Defendants unreasonably delayed in seeking arbitration, that many of its claims arise from common-law or statutory duties rather than from the contracts, and that no claims fall within the scope of any of the arbitration clauses. (*See* Pl.'s Resp. in Opp. 1–2, ECF No. 51 ["Pl.'s Resp."].) At the Court's request, the parties also filed supplemental briefs to address whether questions of arbitrability should be decided by the Court or the arbitrator. (*See* Pl.'s Supp. Br., ECF No. 64; Defs.' Supp. Br., ECF No. 65.)

9. The Court held a hearing on September 12, 2018, at which all parties were represented. The motion is ripe for determination.

## II.
## LEGAL STANDARD

10. At the hearing, the parties agreed that the Federal Arbitration Act ("FAA") governs the resolution of these motions. Each contract includes a choice-of-law provision stating that questions of arbitrability are governed by the FAA and federal common law rather than state law. (*See* Agent Agreement § 11.2(F); Referral Agreement § 10(C)(7); Territory Manager Agreement § 14(C)(7).)

11. "Nonetheless, 'even when the FAA governs a dispute, state law fills procedural gaps in the FAA as it is applied in state courts.'" *Gaylor, Inc. v. Vizor, LLC*, 2015 NCBC LEXIS 102, at \*12 (N.C. Super. Ct. Oct. 30, 2015) (quoting *Cold Springs Ventures, LLC v. Gilead Scis., Inc.*, 2014 NCBC LEXIS 10, at \*8 (N.C. Super. Ct. Mar. 26, 2014)). By statute, when faced with a dispute concerning a purported agreement to arbitrate, this Court must "proceed summarily to decide the issue and order the parties to arbitrate unless it finds that there is no enforceable agreement to arbitrate." N.C. Gen. Stat. § 1-569.7(a)(2). "[I]n determining the threshold issue of whether a mandatory arbitration agreement exists, the court necessarily must sit as a finder of fact." *Capps v. Blondeau*, 2010 NCBC LEXIS 10, at \*7 n.6 (N.C. Super. Ct. Apr. 13, 2010); *see also Griessel v. Temas Eye Ctr., P.C.*, 199 N.C. App. 314, 317, 681 S.E.2d 446, 448 (2009) ("[A]n order denying a motion to compel arbitration must include findings of fact as to 'whether the parties had a valid agreement to arbitrate'

and, if so, 'whether the specific dispute falls within the substantive scope of that agreement.'" (citations omitted)).

## III.
## ANALYSIS

12. Deciding whether a claim is arbitrable is "a two-step inquiry." *Peabody Holding Co., LLC v. United Mine Workers of Am.*, 665 F.3d 96, 101 (4th Cir. 2012). The court must first determine whether the parties intended for the arbitrator or the court to decide the arbitrability of a dispute. *See id.* Only when the court is the proper decision maker should it then decide whether the dispute is in fact arbitrable. *See id.*

13. At the first step, gateway questions of arbitrability are usually reserved for judicial determination. *See, e.g.*, *Virginia Carolina Tools, Inc. v. Int'l Tool Supply, Inc.*, 984 F.2d 113, 117 (4th Cir. 1993); *Hall v. Dancy*, 2018 NCBC LEXIS 63, at *5–6 (N.C. Super. Ct. June 27, 2018). But "parties can, and often do, delegate arbitrability to the arbitrator." *Charlotte Student Hous. DST v. Choate Constr. Co.*, 2018 NCBC LEXIS 88, at *8 (N.C. Super. Ct. Aug. 24, 2018). When there is clear and unmistakable evidence that the parties agreed to arbitrate arbitrability, courts must enforce the delegation just as they would enforce any other term of the parties' agreement. *See AT&T Techs., Inc., v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986); *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 69 (2010).

14. At the second step, courts must apply ordinary principles of contract law. *See, e.g.*, *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). In applying these principles, though, "due regard must be given to the federal policy favoring

arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration." *Volt Info. Scis. Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 475–76 (1989). Put another way, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

15. Applying this two-step inquiry here is a challenge. The three arbitration agreements have different but overlapping language, and two of the three combine what appears to be a broad delegation of arbitrability to the arbitrator with a carve-out that narrows the scope of arbitrable issues. The agreements were also signed by different parties: Rice and Messer signed only the Agent Agreement; the Moore Defendants signed only the Territory Manager Agreement; and Messer Financial Group signed both the Agent Agreement and the Referral Agreement. The Court considers each in turn.

## A. Rice and Messer

16. Both sides agree that the Agent Agreement delegates gateway questions of arbitrability to the arbitrator. (*See* Pl.'s Supp. Br. 2, 5; Defs.' Supp. Br. 3–4.) They do so because the agreement incorporates the AAA Rules, which state that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." AAA, Commercial Arbitration Rules and Mediation Procedures, Rule 7(a) (Oct. 1, 2013). "[V]irtually every [federal] circuit to have considered the issue" has held that incorporation of the AAA Rules

into an arbitration agreement serves as clear and unmistakable evidence that the parties agreed to arbitrate arbitrability. *Oracle Am., Inc. v. Myriad Grp., A.G.*, 724 F.3d 1069, 1074 (9th Cir. 2013) (listing cases); *see also Epic Games, Inc. v. Murphy-Johnson*, 247 N.C. App. 54, 63, 785 S.E.2d 137, 145 (2016).

17. For Rice and Messer, there is nothing else for the Court to decide. They are signatories only to the Agent Agreement. Worldwide concedes that its claim for breach of that agreement is subject to arbitration. (*See* Pl.'s Supp. Br. 5.) And the parties' remaining disputes concern whether Defendants waived their right to arbitrate and whether the non-contract claims fall within the scope of the arbitration clause—that is, whether conspiracy, unjust enrichment, and related claims are claims "arising from or relating to" the Agent Agreement. (Agent Agreement § 11.2.) Those disputes are questions of arbitrability for the arbitrator to decide.

18. Although Worldwide contends that the Court should not compel arbitration of its non-contract claims, it provides no sound basis for its position. Worldwide does not, for example, cite or rely on the line of cases holding that a trial court may refuse to send issues of arbitrability to the arbitrator if they are "wholly groundless." *E.g.*, *Archer & White Sales, Inc. v. Henry Schein, Inc.*, 878 F.3d 488, 495 (5th Cir. 2017), *cert. granted* 86 U.S.L.W. 3640 (U.S. June 25, 2018) (No. 17-1272); *but see Jones v. Waffle House, Inc.*, 866 F.3d 1257, 1268–69 (11th Cir. 2017) (rejecting "wholly groundless" exception).

19. Even if it had, the Court would conclude that Rice and Messer's assertion of arbitrability is not wholly groundless. The unjust-enrichment claim depends on

allegations that Worldwide conferred benefits on Rice and Messer "under" the Agent Agreement. (Compl. ¶ 57.) The tortious-interference claim depends on allegations that Rice and Messer interfered with the contractual obligations of another Smart Choice® agent. (*See* Compl. ¶¶ 62–66.) And the claims for conspiracy, trade-secret misappropriation, and unfair trade practices all depend, in part, on the allegations that Rice and Messer breached the Agent Agreement or misused the confidential information received under it. (*See* Compl. ¶¶ 72, 78, 86, 90.) It is not wholly groundless to contend that these claims arise out of or relate to the Agent Agreement. And whether they do, in fact, arise out of or relate to the agreement is a question for the arbitrator, not for this Court.

20. In its supplemental brief, Worldwide requests leave to amend its complaint to remove the claim for breach of the Agent Agreement, apparently believing that, in the absence of a contract claim, the non-contract claims would not be subject to arbitration. (*See* Pl.'s Supp. Br. 5.) This is incorrect. The presence or absence of a contract claim has little bearing on whether the parties agreed to arbitrate other claims. *See, e.g., U.S. Nutraceuticals, LLC v. Cyanotech Corp.*, 769 F.3d 1308, 1312 (11th Cir. 2014). Because Worldwide does not dispute that the Agent Agreement includes a valid arbitration clause, even if it dismissed its claim for breach of that agreement, Rice and Messer would be entitled to rely on the arbitration clause and to argue that any non-contract claims fall within its scope. In that circumstance, the question of arbitrability would still be one for the arbitrator. The Court therefore

denies leave to amend because an amendment eliminating the claim for breach of contract would not affect the arbitrability of any other claims.

21. In short, Worldwide, Rice, and Messer clearly and unmistakably delegated gateway questions of arbitrability to the arbitrator. All claims asserted against Rice and Messer shall be submitted to binding arbitration.

B. The Moore Defendants

22. Although the Moore Defendants are not parties to the Agent Agreement,[2] they rely on it as a basis for compelling arbitration of the claims asserted against them. (*See* Defs.' Mem. 11 n.9.) There are some circumstances in which a nonsignatory may enforce an arbitration agreement against a signatory. *See, e.g.*, *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GmbH*, 206 F.3d 411, 415 (4th Cir. 2000); *Charlotte Student Hous.*, 2018 NCBC LEXIS 88, at *11. But the Moore Defendants do not contend that any of those circumstances exist here. Thus, if the claims against the Moore Defendants are arbitrable, it must be due to the arbitration clause in the Territory Manager Agreement, not the Agent Agreement.

23. The Territory Manager Agreement requires arbitration of disputes "arising from [the agreement] and the business relationship between" Worldwide and the Moore Defendants. (Territory Manager Agreement § 14(C).) Like the Agent Agreement, the Territory Manager Agreement incorporates the AAA Rules. (*See*

---

[2] The Moore Defendants did enter into their own Smart Choice® Agent Agreement in June 2015, and that agreement includes an arbitration clause identical to the Agent Agreement signed by the Messer Defendants. (*See* Mot. to File Under Seal Ex. B § 11.2) Because the Moore Defendants do not seek to compel arbitration on the basis of the June 2015 agreement, though, the Court does not consider it.

Territory Manager Agreement § 14(C).)  Unlike the Agent Agreement, though, it includes an express carve-out, stating that neither party "will be compelled to arbitrate: (i) any claim or dispute involving actual or threatened disclosure or misuse of confidential information; (ii) a breach of any covenant not to compete; or (iii) a violation of non-solicitation provisions." (Territory Manager Agreement § 14(D).)

24. This raises a difficult question: does a carve-out in an arbitration clause require the Court to decide questions of arbitrability even though the clause also incorporates the AAA Rules?  Worldwide contends that it does; Defendants say no. (*See* Pl.'s Supp. Br. 3–5; Defs.' Supp. Br. 2–4.)  Both sides focus on a recent decision from this Court that applies Delaware law, on the theory that federal law (which governs here) is the same. *See Local Soc., Inc. v. Stallings*, 2017 NCBC LEXIS 94, at *23 (N.C. Super. Ct. Oct. 9, 2017) (concluding, under Delaware law, that arbitrability was for the Court to decide despite incorporation of AAA Rules).

25. In fact, the federal courts of appeals are divided on this question.  At least the Second and Fifth Circuits have held that courts must decide the arbitrability of claims arguably subject to a carve-out provision, even if the agreement also incorporates the AAA Rules.  *See Archer & White Sales*, 878 F.3d at 494, 497; *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1032 (2d Cir. 2014); *see also Turi v. Main St. Adoption Servs., LLP*, 633 F.3d 496, 511 (6th Cir. 2011) (holding that incorporation of AAA Rules did not delegate arbitrability to arbitrator when scope of arbitration clause was narrow).  By contrast, the Ninth and Tenth Circuits have held that incorporation of the AAA Rules evidences an intent to delegate

arbitrability to the arbitrator regardless of a carve-out. *See Oracle*, 724 F.3d at 1076; *Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1275, 1292–93 (10th Cir. 2017).

26. Because these cases do not give rise to any clear rule of federal law, the Court looks to first principles. The United States Supreme Court has stressed that arbitration "is a matter of consent, not coercion." *Volt Info. Scis.*, 489 U.S. at 479. "[P]arties are generally free to structure their arbitration agreements as they see fit," including by agreeing to arbitrate arbitrability. *Id.* But no party should "be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960). Although there is a liberal federal policy favoring arbitration agreements, that policy does not apply to agreements to arbitrate arbitrability. *See Howsam v. Dean Witter Reynolds*, 537 U.S. 79, 83 (2002). The presumption instead is that parties do not intend to delegate arbitrability because presuming otherwise "might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide." *First Options*, 514 U.S. at 945.

27. Bearing this guidance in mind, it is the Court's duty to enforce the Territory Manager Agreement according to its terms and under ordinary principles of contract law. Here, the parties were free to design an arbitration clause that refers to the AAA Rules and also carves out specific claims. The potential conflict between the two terms is neither unusual nor insoluble. Contracts often include terms that could be read to be in tension with one another, and when they do, the Court's task "is not to find discord in differing clauses, but to harmonize all clauses if possible." *State v.*

*Philip Morris USA Inc.*, 363 N.C. 623, 632, 685 S.E.2d 85, 91 (2009) (citation and quotation marks omitted).

28. Reading the Territory Manager Agreement as a whole, the Court concludes that the parties intended to divide questions of arbitrability between the Court and the arbitrator. Section 14(C) represents the parties' agreement to arbitrate disputes arising out of their relationship under the AAA Rules "unless" the disputes are "excepted from" arbitration by the carve-out in section 14(D). (Territory Manager Agreement § 14(C).) Section 14(D) goes on to state that neither side "will be compelled to arbitrate" claims recited in the carve-out. (Territory Manager Agreement § 14(D).) Taken together, this language requires the Court to decide whether a given claim falls within the carve-out and, thus, whether it is subject to arbitration. To hold otherwise would require compelling Worldwide to arbitrate those claims, which is precisely what the agreement forbids. On the other hand, if arbitrability disputes arise for claims falling outside the carve-out, those disputes are for the arbitrator under the terms of the AAA Rules. By construing the contract this way, the Court gives meaning to the parties' agreement to incorporate the AAA Rules and to exclude specific claims from arbitration.

29. The Court further concludes that all of Worldwide's claims against the Moore Defendants fall within the carve-out. Worldwide's claim for breach of contract turns on the contract's non-compete, non-solicitation, and confidentiality restrictions. (Compl. ¶ 54.) The non-contract claims all arise from allegations that the Moore Defendants entered into the contract for the purpose of obtaining Worldwide's

confidential information and trade secrets so as to compete unlawfully against Worldwide. (*See, e.g.*, Compl. ¶¶ 54, 59, 71, 77, 93.) Thus, each asserted claim is, at a minimum, a "claim or dispute involving actual or threatened disclosure or misuse of confidential information," as set forth in section 14(D). (Territory Manager Agreement § 14(D).)

30. The claims asserted against the Moore Defendants are therefore not arbitrable. The Court denies the motion to compel arbitration as to those claims.

## C. Messer Financial Group

31. The claims against Messer Financial Group present a different wrinkle. Messer Financial Group is a signatory not only to the Agent Agreement but also to the Referral Agreement, which contains an arbitration clause identical to the one contained in the Territory Manager Agreement. (*See* Referral Agreement § 10(C).) The question then is who decides arbitrability issues when one arbitration agreement delegates them to the arbitrator and a second agreement reserves at least some issues for the Court.

32. Neither side was able to find case law squarely on point. The Court's research, though, reveals a clear answer: the arbitrator must decide arbitrability. The Eleventh Circuit recently held as much in a case with highly similar facts. *See U.S. Nutraceuticals*, 769 F.3d at 1311 (compelling arbitration when one relevant agreement incorporated AAA Rules and a second agreement had a carve-out for breach of confidentiality restrictions). Several federal district courts have reached the same conclusion. *See, e.g.*, *Cochrane v. Open Text Corp.*, 2015 U.S. Dist. LEXIS

78006, at *8–10 (N.D. Cal. June 16, 2015); *Adam Techs. Int'l S.A. de C.V. v. Sutherland Global Servs, Inc.*, 2011 U.S. Dist. LEXIS 160155, at *4 (N.D. Tex. May 26, 2011).

33. These decisions are compelling. Worldwide concedes that the Agent Agreement includes a valid arbitration clause and that it clearly and unmistakably delegates questions of arbitrability to the arbitrator. It is at least arguably the case that all claims asserted against Messer Financial Group arise out of or relate to the Agent Agreement. For the Court to decide that the claims are not arbitrable would defeat the parties' intent to have the arbitrator make that decision.

34. Apart from its request for leave to amend its complaint to remove the claim for breach of the Agent Agreement (which the Court has already rejected), Worldwide offers no other argument to support denial of the motion to compel arbitration of the claims asserted against Messer Financial Group. Having determined that Worldwide and Messer Financial Group clearly and unmistakably delegated gateway questions of arbitrability to the arbitrator in the Agent Agreement, the Court concludes that all claims asserted against Messer Financial Group must be submitted to binding arbitration.

### D. Scope of Stay Pending Arbitration

35. Defendants ask the Court to stay all proceedings pending resolution of arbitration. By statute, "[i]f the court orders arbitration, the court on just terms shall stay any judicial proceeding that involves a claim subject to the arbitration." N.C. Gen. Stat. § 1-569.7(g). If the claim to be arbitrated is severable from any remaining

claims, the stay may be limited to the arbitrable claim. *Id.* A court's decision to grant or deny a stay is discretionary. *See Sloan Fin. Grp., Inc. v. Beckett*, 159 N.C. App. 470, 485, 583 S.E.2d 325, 334 (2003); *Gaylor*, 2015 NCBC LEXIS 102, at *21–22.

36. The claims against the Moore Defendants are tied to the same core set of facts as the claims against the Messer Defendants—a conspiracy between the two to obtain Worldwide's confidential information and then jointly to create a competing business. (*See, e.g.*, Compl. ¶ 20.) Given the overlap, it would be more efficient to await the arbitrator's decision—at least as to the question of arbitrability—before moving forward with this litigation. Accordingly, the Court, in its discretion, stays all claims pending the arbitrator's decision as to the arbitrability of the claims against the Messer Defendants. Upon receiving the arbitrator's decision as to arbitrability, the Court will revisit the stay to determine whether it should be maintained as to the claims against the Moore Defendants or should instead be limited to the arbitrable claims, if any.

IV.
CONCLUSION

37. The Court **FINDS** and **CONCLUDES** as follows:

    a. The Agent Agreement, the Referral Agreement, and the Territory Manager Agreement include valid arbitration agreements. All are governed by the FAA.

    b. Worldwide, Rice, and Messer clearly and unmistakably delegated gateway questions of arbitrability to the arbitrator in the Agent Agreement. The

arbitrator must decide any arbitrability disputes as to the claims against Rice and Messer in the first instance.

c. Worldwide and Messer Financial Group clearly and unmistakably delegated gateway questions of arbitrability to the arbitrator in the Agent Agreement. The arbitrator must decide any arbitrability disputes as to the claims against Messer Financial Group in the first instance.

d. Worldwide and the Moore Defendants did not clearly and unmistakably delegate gateway question of arbitrability to the arbitrator in the Territory Manager Agreement. The claims asserted against the Moore Defendants do not fall within the scope of the arbitration clause contained within the Territory Manager Agreement and, as a result, are not arbitrable.

38. For these reasons, the Court **GRANTS** the motion as to the Messer Defendants and **ORDERS** all claims against the Messer Defendants to arbitration. The Court **DENIES** the motion as to the Moore Defendants and **ORDERS** that the Moore Defendants shall not be compelled to arbitration. The Court **STAYS** all claims pending the arbitrator's decision on the arbitrability of the claims asserted against the Messer Defendants.

39. The Court further **ORDERS** that the parties shall notify the Court of the arbitrator's decision as to arbitrability within seven days after the decision has been issued.

This the 2nd day of October, 2018.

                              /s/ Adam M. Conrad
                              Adam M. Conrad
                              Special Superior Court Judge
                               for Complex Business Cases