IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA15-454

Filed: 19 April 2016

Wake County, No. 14 CV 003722

EPIC GAMES, INC., Plaintiff

v.

TIMOTHY F. MURPHY-JOHNSON, Defendant

Appeal by defendant from order entered 18 July 2014 by Judge G. Bryan Collins, Jr. in Wake County Superior Court. Heard in the Court of Appeals 6 October 2015.

> *Hunton & Williams, LLP, by R. Dennis Fairbanks, Douglas W. Kenyon, Ryan G. Rich, and Michael R. Shebelskie, for plaintiff-appellee.*

> *David E. Shives, PLLC, by David E. Shives, and McGowan, Hood & Felder, LLC, by Chad A. McGowan, William A. McKinnon, and Jordan C. Calloway, for defendant-appellant.*

CALABRIA, Judge.

Timothy F. Murphy-Johnson ("Johnson") appeals from an order granting Epic Games, Inc.'s ("Epic Games") application for judicial relief to enjoin arbitration in part. We reverse.

## *I. Background*

Defendant, Johnson, is a computer programmer. While attending college in the United Kingdom, he founded a software company, Artificial Studios, and created Reality Engine, a successful computer software program that served as a platform for game developers to construct video games. In March 2005, Timothy Sweeney, the

founder and largest shareholder of Epic Games, along with Michael Capps, the company's president, negotiated with then-twenty-one-year-old Johnson to purchase Reality Engine and recruited him to move from London to North Carolina to work for Epic Games. On 10 May 2005, Johnson executed seven contracts that purported to sell Artificial Studios and Reality Engine and its related intellectual property to Epic Games, in exchange for employment with Epic Games, company stock options, and cash.

The seven contracts can be divided into two groups. First, Epic Games bought Reality Engine from Artificial Studios and then licensed it back to Artificial Studios. Those agreements were labeled "Reality Engine Acquisition Agreement" and "Reality Engine Limited License Agreement." Second, Epic Games hired Johnson and executed five related contracts. Those agreements were labeled "Stock Option Agreement," "Residual Rights Acquisition Agreement," "Non-Competition Agreement," "Confidentiality Obligations and Intellectual Property Rights Agreement," and "Employment Agreement."

The Employment Agreement contained the following arbitration clause:

> Any disputes between Employee and Epic in any way concerning his employment, this Agreement or this Agreement's enforcement, including the applicability of this Paragraph, shall be submitted at the initiative of either party to mandatory arbitration before a single arbitrator and conducted pursuant to the rules of the American Arbitration Association [("AAA")] applicable to the arbitration of employment disputes then in effect, or its

successor, provided however, that this Paragraph does not apply to the Confidentiality Obligations and Intellectual Property Rights Agreement referred to in Paragraph 7, and attached as <u>Exhibit A</u>. The decision of the arbitrator may be entered as judgment in any court of the State of North Carolina.

The Employment Agreement also contained a choice-of-law provision: "This Agreement shall be governed by the law of the State of North Carolina[.]"

According to the Stock Option Agreement, Johnson's stock options and bonuses were to vest over a four-year period. For this reason, according to Johnson, he requested that Epic Games draft a strict for-cause termination provision in the Employment Agreement. Johnson wrote Capps:

> My lawyer's been explaining to me that "for cause" termination is not something I should count on as ensuring I will be employed, as so long as the determination of cause rests on Epic you can terminate me and the burden of proof would be on me, which means I'd have to litigate at a cost that would be prohibitive. Therefore while he thinks that's "fair" for purely employment terms, he said it's not very sensible to tie the $75K and stock options related to the deal to employment in this way if I feel this is part of the value for selling my company.
>
> My first question is therefore whether you're prepared to narrow "for cause" to what we initially agreed, namely that I'd have to commit some crime or other malicious act or act of total incompetence, and the burden of proof in "for cause" termination rests on Epic, not me. . . . .

Epic Games' Vice President of Business Development, Jay Wilbur, responded:

> Our goal is to have you join the Epic family. What you read in the employment agreement is that [sic] same for all Epic

employees. I'm willing to consider changes but I need a little something back for it.

I'll give you the narrower "for cause" if you give me the Reality Engine marks, domains, websites, etc. as part of that assignment.

Johnson agreed. The narrowed "for cause" provision read:

**b. Termination For Cause.** Employer may terminate Employee's employment at any time, with or without notice, for any one or more of the following reasons: (i) willful and continual failure to substantially perform his duties with Employer (other than a failure resulting from the Employee's disability) and such failure continues after written notice to Employee providing a reasonable description of the basis for the determination that Employee has failed to perform his duties, (ii) indictment for a criminal offense other than misdemeanors not required to be disclosed under the federal securities laws, (iii) breach of this Agreement in any material respect and such breach is not susceptible to remedy or cure and has already materially damaged the [sic] Epic, or is susceptible to remedy or cure and no such damage has occurred, is not cured or remedied reasonably promptly after written notice to Employee providing a reasonable description of the breach, (iv) Employee's breach of fiduciary duty to Employer, material unauthorized use or disclosure of Employer's confidential or proprietary information or competition with Employer; (iv) [sic] Employee's intentional conduct or omission which reasonably has or is likely to have the effect of materially harming Employer's business; (v) conduct that the Employer has reasonably determined to be dishonest, fraudulent, unlawful or grossly negligent, and such conduct is not cured or remedied reasonably promptly after written notice to Employee providing a reasonable description of the conduct at issue, any one of which shall be deemed "Cause" for dismissal. The determination of whether an event, act or omission constitutes "Cause" hereunder shall rest in the reasonable

exercise of the Employer's discretion. . . .

On 20 March 2006, approximately two months before his first round of stock options and bonuses were scheduled to vest, Epic Games fired Johnson. When Johnson was "terminated with cause" by Epic Games, he had been employed for less than one year, from 10 May 2005 until 20 March 2006. The termination letter stated, in pertinent part:

> We regret to inform you that your employment with Epic Games is terminated with cause effective March 20, 2006 as a result of your repeated performance problems, conduct issues and attendance concerns, which you have failed to remedy despite verbal and written warnings. Epic has determined that these issues at the very least amount to a material failure to devote your entire professional time, attention, skill and energies to Epic's business and the responsibilities assigned to you by Epic, a willful and continual failure to substantially perform your duties, gross negligence, and intentional conduct that is potentially materially damaging to Epic's business. Any one of these supports a "for cause" termination.

On 7 March 2014, Johnson filed a demand for arbitration with the AAA alleging breach of contract, breach of the covenant of good faith and fair dealing, and breach of fiduciary duty. Specifically, Johnson alleged that Epic Games breached the Employment Agreement by wrongfully terminating him; breached the covenant of good faith and fair dealing under the Employment Agreement and the related agreements by depriving him of the benefit of the sale of Artificial Studios and Reality Engine; and breached fiduciary duties owed to him under the Employment

Agreement, Stock Option Agreement, and related agreements. Johnson sought the following pertinent forms of relief:

> 1. [A] declaration that Epic Games, Inc. willfully breached [the] Employment Agreement;
>
> 2. . . . [D]amages for [Epic Games'] breach of at least $11,300,000, representing the value of stock, bonus, and other payments due [Johnson] under the Employment Agreement, or, in the alternative, that [Johnson] be awarded 1,966 shares of undiluted stock in Epic Games, Inc. and $4,300,000 in other payments due;
>
> 3. . . . [A]ny copyright or other intellectual property assignment from [Johnson] or Artificial Studios to Epic be declared null and void;
>
> 4. . . . [L]ost profits of Artificial Studios;
>
> 5. . . . [P]unitive damages for conduct that reflects fraud, deceit, or malicious behavior[.]

On 24 March 2014, Epic Games filed a motion, as an application for judicial relief, to enjoin arbitration in part in Wake County Superior Court, alleging that Epic Games never consented to arbitrate certain claims asserted by Johnson. Epic Games also alleged that Johnson did not object for eight years to the termination of his employment. Johnson denied this allegation in his answer and counterclaim.

On 18 April 2014, Johnson removed the case to the United States District Court for the Eastern District of North Carolina. On 2 May 2014, after hearing Epic Games' application to enjoin arbitration in part, the Honorable G. Bryan Collins, Jr. of Wake County Superior Court entered an order in favor of Epic Games. (This order

was later stricken due to lack of jurisdiction.)  On 9 July 2014, the federal court remanded the case to Wake County Superior Court.

On 18 July 2014, the trial court held a *de novo* hearing on Epic Games' application for judicial relief and to enjoin arbitration in part.  Subsequently, the trial court granted Epic Games' application for judicial relief and entered a written order enjoining arbitration of the following claims:

> 4.1 The third cause of action for breach of fiduciary duty alleged in his arbitration demand.
>
> 4.2 The claim for stock or its monetary value under the parties' former Stock Option Agreement.
>
> 4.3 The request for a declaration that any copyright or other intellectual property assignment [Johnson] gave to Epic be declared null and void.
>
> 4.4 The request for a declaration that any copyright or other intellectual property assignment Artificial Studios, Inc. gave to Epic be declared null and void.
>
> 4.5 The claim for lost profits of Artificial Studios.

According to the trial court's order, Johnson could "proceed to arbitrate the issue whether Epic [Games] breached the Employment Agreement by discharging him[.]"  However, the court permanently enjoined Johnson from arbitrating the matters identified in paragraphs 4.1 to 4.5.  Johnson appeals.

## II. Jurisdiction

The order on appeal permanently stays arbitration of five claims but permits Johnson's claim of breach of contract to proceed. Although this order is interlocutory,

> [a]ppellate review of an interlocutory order is permitted under N.C.G.S. § 7A–27(d)(1) when the order affects a substantial right, and review is permitted under N.C.G.S. § 1–277(a) of any order involving a matter of law or legal inference which affects a substantial right. It is well established that the right to arbitrate a claim is a substantial right which may be lost if review is delayed, and an order denying arbitration is therefore immediately appealable.

*In re W.W. Jarvis & Sons*, 194 N.C. App. 799, 802, 671 S.E.2d 534, 536 (2009) (citations, quotation marks, brackets, and ellipses omitted). Because the order enjoins certain claims from proceeding to arbitration, a substantial right exists which may be lost absent immediate appellate review. *Id.* Therefore, this Court has jurisdiction.

### III. Analysis

**A. Governing Law**

As an initial matter, it is unclear whether the arbitration clause is governed by North Carolina's Revised Uniform Arbitration Act ("RUAA"), the Federal Arbitration Act ("FAA"), or some other law. Determining whether the FAA applies "is critical because the FAA preempts conflicting state law[.]" *Sillins v. Ness*, 164 N.C. App. 755, 757–58, 596 S.E.2d 874, 876 (2004). In this case, although the trial court's order referenced provisions of the RUAA as conferring upon it the authority

to permanently enjoin certain claims asserted by Johnson, the court below made no determination as to whether state or federal arbitration law governs. "[T]he trial court should have addressed the issue of choice of law before addressing any other legal issue." *Bailey v. Ford Motor Co.*, __ N.C. App. __, __, 780 S.E.2d 920, 924 (2015) (citation omitted), *disc. review denied*, __ N.C. __, __ S.E.2d __ (2016). This is because

> " '[w]hether a contract evidence[s] a transaction involving commerce within the meaning of the [FAA] is a question of fact' for the trial court[,]" *King v. Bryant*, 225 N.C. App. 340, 344, 737 S.E.2d 802, 806 (2013) (citation omitted), and this Court "cannot make that determination in the first instance on appeal[.]" *Cornelius v. Lipscomb*, 224 N.C. App. 14, 18, 734 S.E.2d 870, 872 (2012).

*T.M.C.S., Inc. v. Marco Contractors, Inc.*, __ N.C. App. __, __, 780 S.E.2d 588, 592 (2015).

Our appellate courts have remanded cases for the trial court to make the initial determination of whether the FAA governs an arbitration agreement, when that determination was critical to the disposition of the case. *See Eddings v. S. Orthopedic & Musculoskeletal Assocs., P.A.*, 147 N.C. App. 375, 385, 555 S.E.2d 649, 656 (2001) (Greene, J., dissenting) (reasoning that remand was required for trial court to determine initially whether FAA or RUAA governed arbitration clause, because the majority determined initially that FAA applied and resolution of governing law was dispositive to the case), *rev'd per curiam for reasons stated in the dissent*, 356 N.C. 285, 286, 569 S.E.2d at 645, 645 (2002); *see also Sillins v. Ness*, 164 N.C. App. 755,

759, 596 S.E.2d 874, 877 (2004) (reversing and remanding order denying motion to compel arbitration "[b]ecause the question whether the FAA or the UAA governs this arbitration agreement determines whether the trial court properly denied the motion to compel arbitration").

In the instant case, however, whether federal or state arbitration law governs has no bearing on our disposition of the case. Both the FAA and the RUAA dictate that arbitration is strictly a matter of contract. *See Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989) (noting "[t]he thrust of the federal law is that arbitration is strictly a matter of contract[.]") (citation, quotation marks, and brackets omitted); *see also Sloan Fin. Grp., Inc. v. Beckett*, 159 N.C. App. 470, 478, 583 S.E.2d 325, 330 (2003) ("[W]hether a dispute is subject to arbitration is a matter of contract law."), *aff'd per curiam*, 358 N.C. 146, 593 S.E.2d 583 (2004). Under either law, the plain language of the arbitration clause, properly interpreted, delegates the threshold issue of substantive arbitrability to the arbitrator—not to the trial court. Therefore, we decline to reverse and remand the trial court's ruling on the basis that it did not expressly find whether the FAA applies. *See Sloan Fin. Grp.,* 159 N.C. App. at 479, 583 S.E.2d at 330 (declining to reverse and remand trial court's order in light of party's argument that trial court failed to apply the FAA, when the analysis was virtually identical and the same conclusion would be reached under either federal or state law).

**B. Standard of Review**

"[W]hether a particular dispute is subject to arbitration is a conclusion of law, reviewable *de novo* by the appellate court." *Carter v. TD Ameritrade Holding Corp.*, 218 N.C. App. 222, 226, 721 S.E.2d 256, 260 (2012) (citation omitted). Issues relating to the interpretation of terms in an arbitration clause are matters of law, which this Court reviews *de novo*. *See, e.g.*, *Bailey*, __ N.C. App. at __, 780 S.E.2d at 924 (citation omitted).

**C. Arbitrability**

Johnson contends that the trial court erred by enjoining certain disputes from proceeding to arbitration, because according to the plain language of the arbitration clause, the threshold issue of substantive arbitrability was delegated to an arbitrator. We agree.

"[O]nly those disputes which the parties agreed to submit to arbitration may be so resolved." *Rodgers Builders, Inc. v. McQueen*, 76 N.C. App. 16, 23, 331 S.E.2d 726, 731 (1985). "To determine if a particular dispute is subject to arbitration, this Court must examine the language of the agreement, including the arbitration clause in particular, and determine if the dispute falls within its scope." *Fontana v. S.E. Anesthesiology Consultants, P.A.*, 221 N.C. App. 582, 589, 729 S.E.2d 80, 86 (2012) (citation omitted). Because arbitration is a matter of contract, contract principles govern the interpretation of an arbitration clause. *See, e.g., Harbour Point*

*Homeowners' Ass'n, Inc. v. DJF Enters., Inc.,* 201 N.C. App. 720, 725, 688 S.E.2d 47, 51, *disc. review denied,* 364 N.C. 239, 698 S.E.2d 397 (2010).

"When the language of the arbitration clause is 'clear and unambiguous,' we may apply the plain meaning rule to interpret its scope." *Fontana,* 221 N.C. App. at 588–89, 729 S.E.2d at 86. If the language is ambiguous, "[o]ur strong public policy requires that the courts resolve any doubts concerning the scope of arbitrable issues in favor of arbitration." *Johnston Cty. v. R.N. Rouse & Co.,* 331 N.C. 88, 91, 414 S.E.2d 30, 32 (1992); *see also Cyclone Roofing Co. v. LaFave Co.,* 312 N.C. 224, 229, 321 S.E.2d 872, 876 (1984) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.") (quoting *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24–25, 74 L. Ed. 2d 765, 785 (1983)). Furthermore, "[p]ursuant to well settled contract law principles, the language of the arbitration clause should be strictly construed against the drafter of the clause." *Harbour Point,* 201 N.C. App. at 725, 688 S.E.2d at 51.

In this case, Epic Games drafted the arbitration clause, which provided in pertinent part:

> Any disputes between Employee and Epic in any way concerning his employment, this Agreement or this Agreement's enforcement, including the applicability of this Paragraph, shall be submitted at the initiative of

> either party to mandatory arbitration before a single
> arbitrator and conducted pursuant to the rules of the
> [AAA] applicable to the arbitration of employment disputes
> then in effect, or its successor, provided however that this
> Paragraph does not apply to the Confidentiality
> Obligations and Intellectual Property Rights Agreement
> referred to in Paragraph 7, and attached as Exhibit A.

The plain language of the arbitration clause is clear and unambiguous. It provides for mandatory arbitration of "*[a]ny disputes* between [Johnson] and Epic [Games] *in any way concerning* his employment, this Agreement or this Agreement's enforcement[.]" These broad phrases indicate the drafter, Epic Games, intended for an extensive range of issues relating to Johnson's employment or the Employment Agreement to fall within the arbitration clause's scope. Moreover, this expansive clause expressly covers disputes "in any way concerning . . . the applicability of this Paragraph[.]" Indeed, the "dispute[] between [Johnson] and Epic [Games]" on appeal is whether particular claims asserted fall within the scope of the arbitration clause, implicating a matter "concerning" the arbitration clause's "applicability." The language Epic Games employed in drafting the clause makes it clear that any disputes regarding whether the arbitration clause applied to a particular claim should be submitted to arbitration and decided by the arbitrator.

Furthermore, the arbitration clause incorporates the rules of the AAA. Under AAA Employment Rule 6(a), "[t]he arbitrator *shall* have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, *scope* or

validity of the arbitration agreement." (emphases added). Although our state appellate courts have never addressed or decided this issue when interpreting an arbitration clause subject to the RUAA, this Court recently adopted the majority rule among the federal courts of appeal when interpreting an arbitration clause subject to the FAA. In *Bailey*, this Court held that under the FAA, an arbitration clause which incorporated an arbital body's rules, when those rules explicitly delegate the threshold issue of arbitrability to an arbitrator, constitutes "clear and unmistakable" evidence—a more exacting standard than currently exists when interpreting arbitration clauses subject to the RUAA—that the parties agreed to arbitrate issues of substantive arbitrability. *Bailey*, __ N.C. App. at __, 780 S.E.2d at 927. Therefore, both the plain language of the arbitration clause and its incorporation of the AAA rules demonstrate that the parties agreed the arbitrator should decide issues of substantive arbitrability. Even if this broad clause, by itself, does not resolve the issue of whether the parties agreed to arbitrate arbitrability, the requirement for arbitration to be conducted pursuant to the AAA rules does.

As a secondary matter, we note that although the "Confidentiality Obligations and Intellectual Property Rights Agreement" was excluded from the arbitration clause's scope, Epic Games concedes in its brief that this agreement merely "prescrib[es] Johnson's confidentiality obligations and his assignment to Epic of intellectual property created *while employed*." (emphasis added). Neither party

asserts that Johnson's claims fall within the scope of this agreement. Therefore, that agreement is of no consequence to our analysis or disposition of the case.

### *IV. Conclusion*

Based on its plain language and incorporation of the AAA rules, the arbitration clause drafted by Epic Games, properly interpreted, contained a valid agreement to delegate issues of substantive arbitrability to the arbitrator. Therefore, the trial court was without authority to issue an injunction and determine the scope of arbitrable issues. The trial court's order must be reversed.

REVERSED.

Judges BRYANT and ZACHARY concur.