Martin & Jones, PLLC v. Olson, 2017 NCBC 85.

STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE

SUPERIOR COURT DIVISION

17 CVS 1255

MARTIN & JONES, PLLC, JOHN ALAN JONES, and FOREST HORNE,

Plaintiffs,

v.

GEORGE CHRISTOPHER OLSON,

Defendant.

**ORDER ON MOTION TO STAY**

THIS MATTER comes before the Court upon Plaintiffs' Motion to Stay ("Motion"). (Compl. And Mot. To Stay, ECF No. 1.) The Motion, contained in Plaintiff's Complaint, seeks to stay this matter and compel the parties to submit their disputes to an accounting process contained in an Operating Agreement executed by the individual parties.

THE COURT, having considered the Motion, the briefs in support of and in opposition to the Motion, the record evidence, and other appropriate matters of record, FINDS and CONCLUDES, in its discretion, that the Motion should be DENIED for the reasons stated below.

I.   Factual and Procedural Background

1.   Plaintiff Martin & Jones, PLLC ("M&J") is a professional limited liability company engaged in the practice of law, with its headquarters in Raleigh, Wake County, North Carolina. M&J has a written Fourth Amendment and Restatement of

Operating Agreement entered into effective January 10, 2014 ("Operating Agreement"). (ECF No. 7.2 at Ex. A.)

2. Plaintiffs John Alan Jones ("Jones") and Forest Horne ("Horne") are both attorneys licensed in the State of North Carolina and are the sole current members of M&J. Jones and Horne signed the Operating Agreement. (ECF No. 7.2 at Ex. A, p. 33.)

3. Olson is an attorney licensed in the State of North Carolina, and a former member of M&J. Olson began practicing with M&J in January of 2001 and became a member of the firm in 2008. Olson signed the Operating Agreement. (ECF No. 7.2 at Ex. A, p. 33.)

4. On January 20, 2016, Olson notified Jones and Horne of Olson's intention to take early retirement as a member of M&J. (Compl. and Mot. to Stay, ECF No. 1 at ¶ 10.) Olson offered to remain an employee of M&J in an "of counsel" role and continue working on certain matters in exchange for, *inter alia*, payment of his accrued retirement benefits in accordance with the Operating Agreement. (ECF No. 1 at ¶ 11; Answer and Counterclaim, ECF No. 3, at Counterclaim ¶ 30.) Shortly thereafter, however, the parties became embroiled in a dispute. Plaintiffs allege Olson engaged in conduct detrimental to M&J and its client relationships. (ECF No. 1 at ¶¶ 12—14.) Olson alleges that he learned facts leading him to believe Jones and Horne were manipulating M&J's books and records in an attempt to minimize or eliminate his retirement benefits. (ECF No. 3, at Counterclaim ¶¶ 33–42.) Olson

resigned his employment with M&J on January 31, 2016. (ECF No. 3 at Counterclaim ¶ 42.)

5. On January 30, 2017, Plaintiffs filed the Complaint and Motion to Stay ("Complaint"). In the Complaint, Plaintiffs make claims against Olson for breach of the Operating Agreement, breach of fiduciary duty, defamation, tortious interference with contract, and forfeiture of retirement benefits. Plaintiff's' claims are grounded in their allegations that: Olson's work efforts during the last year of his tenure with M&J were inadequate (ECF No. 1 at ¶¶ 5–9); Olson's retirement from the firm was premature and without adequate advance notice (ECF No. 1 at ¶ 10); Olson made libelous accusations against M&J (ECF No. 1 at ¶¶ 12–14); and Olson engaged in alleged competition with M&J since his retirement (ECF No. 1 at ¶ 20). In addition, the Complaint seeks a declaratory judgment regarding "the parties respective rights under the Operating Agreement with respect to…the calculations of law firm book value, prepaid client expenses, and determination of 2015 year-end profits." (ECF No. 1 at ¶ 43.)

6. On April 4, 2017, Olson filed an Answer and Counterclaim ("Counterclaim"). Olson denies Plaintiffs' substantive allegations, denies liability to Plaintiffs, and alleges that Jones and Horne have manipulated M&J's accounting records and books to deny him his retirement benefits. Olson raises counterclaims for breach of the Operating Agreement, breach of implied duty of good faith and fair dealing, breach of fiduciary duty, constructive fraud, civil conspiracy, and declaratory judgment. With regard to his retirement benefits, Olson claims M&J has breached

the Operating Agreement by failing to: (a) pay Olson his share of M&J's Prepaid Client Expenses (ECF No. 3, at Counterclaim ¶¶ 51–58); (b) pay Olson his portion of M&J's Law Firm Book Value (ECF No. 3, at Counterclaim ¶¶ 59–64); and (c) pay Olson his distribution from M&J's 2015 profits (ECF No. 3, at Counterclaim ¶¶ 74–82).

7. On February 16, 2017, Plaintiffs filed a Brief in Support of their Motion to Stay. (ECF No. 8.) On March 13, 2017, Defendant filed a Response in Opposition, and on March 27, 2017. (ECF No. 11.) Plaintiffs filed a Reply. (ECF No. 12.)The Motion is ripe for determination.

II. <u>Analysis</u>

8. In their Brief in Support, Plaintiffs seek, pursuant to North Carolina General Statutes § 1-569.7 (hereinafter "G.S."), to compel Olson to arbitrate pursuant to the Operating Agreement. (Pls.' Br. Supp., ECF No. 8 at p. 1.) Both parties have argued the Motion as a motion to stay as well as a motion to compel arbitration. Accordingly, the Court will treat the Motion as one seeking to stay the case and compel arbitration, and will summarily decide the question of arbitrability. *See* G.S. § 1-569.7.

9. The Court must first determine whether the alleged agreement to arbitrate at issue here is governed by North Carolina's Revised Uniform Arbitration Act ("RUAA"), or the Federal Arbitration Act ("FAA"). *Epic Games, Inc. v. Murphy-Johnson*, 785 S.E.2d 137, 142, 2016 N.C. App. LEXIS 434, at *10 (2016). The FAA applies to "a written provision in . . . a contract evidencing a transaction involving

[interstate] commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction." 9 U.S.C. § 2. "Determining whether the FAA applies 'is critical because the FAA preempts conflicting state law[.]'" *Epic Games, Inc.*, 785 S.E.2d at 142, 2016 N.C. App. LEXIS at *10. (quoting *Sillins v. Ness*, 164 N.C. App. 755, 757–58, 596 S.E.2d 874, 876 (2004)). "Moreover, the words 'a contract evidencing a transaction involving commerce' require only that the transaction involve interstate commerce. . . . it is not required, for the FAA to apply, that the parties to the transaction 'contemplate' an interstate commerce connection." *Gaylor, Inc. v. Vizor, LLC*, 2015 NCBC LEXIS 102, *10 (N.C. Super. Ct. Oct. 30, 2015) (quoting *Allied-Bruce Terminix Cos. V. Dobson*, 513 U.S. 265, 273–74, 115 S. Ct. 834 (1995)). "Whether a contract evidence[s] a transaction involving commerce within the meaning of the [FAA] is a question of fact for the trial court." *T.M.C.S., Inc. v. Marco Contrs., Inc.*, 780 S.E.2d 588, 592, 2015 N.C. App. LEXIS 994, at *8 (2015).

10.   Olson argues that the Operating Agreement is not a transaction involving interstate commerce because M&J is a North Carolina professional limited liability company, and Jones and Horne "are only licensed to practice law in North Carolina." (Def.'s Br. Opp. Mot., ECF No. 11 at p. 9.) With their Reply, however, Plaintiffs filed the Affidavit of Forest Horne in which he states that both he and Olson are members of the Bar of the State of Georgia. (Horne Aff., ECF No. 13 at ¶¶ 3–4.) Horne also states that M&J had an office in Georgia until 2014, filed a tax return with the State of Georgia, and that the firm and its attorneys regularly handle cases in states other than North Carolina. (ECF No. 13 at ¶¶ 5—8.) "Although the mere fact that the

parties are from different states does not necessarily compel application of the FAA," contracts under which payments pass across state lines, and transactions are conducted across state lines, involve interstate commerce. *Gaylor, Inc.*, 2015 NCBC LEXIS at *10 (citing *Burke Co. Pub. Schs. Bd. Of Ed. v. Shaver P'ship*, 303 N.C. 408, 418—19, 279 S.E.2d 816, 822 (1981); *Benezra v. Zacks Inv. Research, Inc.*, No. 1:11-CV-596, 2012 U.S. Dist. LEXIS 47769, at *7–8 n.1 (M.D.N.C. Mar. 30, 2012)).

11. The Court finds that the Operating Agreement, between lawyers licensed in multiple states and practicing on behalf of clients in multiple states, is a contract involving interstate commerce within the meaning of the FAA.

12. Though the FAA applies to the Operating Agreement, the FAA does not completely preempt state contract law. *Volt Info. Scis. v. Bd. of Trs.*, 489 U.S. 468, 477, 109 S. Ct. 1248, 1255 (1989) ("The FAA contains no express pre-emptive provision, nor does it reflect a congressional intent to occupy the entire field of arbitration."). "[W]here the validity and enforceability of an arbitration provision is disputed, general principles of state contract law must be applied to determine…threshold issues" of contract formation. *T.M.C.S., Inc.*, 780 S.E.2d at 593, 2015 N.C. App. LEXIS 994, at *10 (citing *e.g.*, *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S. Ct. 1920 (1995)).

13. The parties agreed that interpretation and enforcement of the Operating Agreement shall be governed by North Carolina law. (ECF No. 7.2 at § 15.6.) In addition, none of the parties contend that the Operating Agreement was formed in another state or that another state's law is applicable. Accordingly, the Court will

apply North Carolina law to determine whether the Operating Agreement evidences a valid contract for arbitration between the parties.

14. Under North Carolina law, in deciding whether the parties have an enforceable agreement to arbitrate, the Court must determine "(1) whether the parties have a valid agreement to arbitrate, and (2) whether the subject of the dispute is covered by the arbitration agreement." *Bass v. Pinnacle Custom Homes, Inc.*, 163 N.C. App. 171, 175, 592 S.E.2d 606 (2004). "Both the FAA and the RUAA dictate that arbitration is strictly a matter of contract." *Epic Games, Inc.*, 785 S.E.2d at 142, 2016 N.C. App. LEXIS at *12. It is well established that

> whether a dispute is subject to arbitration is a matter of contract law. Parties to an arbitration must specify clearly the scope and terms of their agreement to arbitrate. Moreover, a party cannot be forced to submit to arbitration of any dispute unless he has agreed to do so.

*Sloan Fin. Group, Inc. v. Beckett*, 159 N.C. App. 470, 478, 583 S.E.2d 325, 330 (2003) (citations omitted).

15. Plaintiffs argue that Section 5.6 of the Operating Agreement is an agreement to arbitrate disputes between M&J's members over accounting issues. Section 5.6, contained in Article Five of the Operating Agreement titled "Accounting," provides as follows:

> In the event of a dispute among the Members with respect to the determination of the net cash flow, net profit, net losses or capital account balances of the Law Firm, an independent certified public accountant shall be engaged by the Law Firm at the Law Firm's expense whose computation of such items shall be binding upon all the Members.

(ECF No. 7.2 at § 5.6.)

16. Plaintiffs contend that the parties should be required to submit any and all "disputes over accounting calculations" raised by the claims in this lawsuit to the binding dispute resolution process in Section 5.6. (ECF No. 8 at p. 2.) The parties do not dispute that Section 5.6 of the Operating Agreement constitutes an agreement between the parties. The question the Court must answer is whether the dispute resolution process in Section 5.6 of the Operating Agreement is an agreement to arbitrate.

17. The FAA does not contain a definition of arbitration. *Wilbert, Inc. v. Homan*, 3:13-cv-30-RJC-DSC, 2013 U.S. Dist. LEXIS 170237, at *5 (W.D.N.C. Dec. 3, 2013). In *Wilbert*, the United States District Court for the Western District of North Carolina held that federal common law must be applied to determine whether a particular dispute resolution process constitutes "arbitration" under the FAA in order "to avoid situations where arbitration means different things in different states." *Id.* at *6 (internal quotations omitted). The Court will look to federal common law to decide if the procedure in Section 5.6 is "arbitration" within the meaning of the FAA.

18. "Under federal law, the Court must determine whether the method of dispute resolution sufficiently resembles 'classic arbitration' to fall within the purview of the [FAA]." *Id.* at *5 (citing *Fit Tech, Inc. v. Bally Total Fitness Holding Corp.*, 374 F.3d 1, 7 (1st Cir. 2004) ("[T]he question is how closely the specified procedure resembles classic arbitration and whether treating the procedure as arbitration serves the intended purposes of Congress.")). In *Fit Tech*, the Court held that common indicia of classic arbitration included provision for a final determination

by "an independent adjudicator," recitation of "substantive standards" by which the adjudicator is chosen and by which the adjudicator will decide the dispute, "and an opportunity for each side to present its case." *Fit Tech, Inc.*, 374 F.3d at 7; *see also Halliburton Co. v. KBR, Inc.*, 446 S.W.3d 551, 559–61, 2014 Tex. App. LEXIS 10181, at *19 (Tex. Ct. of App. 1st Dist. 2014) (applying *Fit Tech*, and concluding that the procedure at issue was "'arbitration in everything but name' because it has the 'common incidents of arbitration'"); *Harker's Distrib., Inc. v. Reinhart Foodservice, L.L.C.*, 597 F. Supp. 2d 926, 936, 2009 U.S. Dist. LEXIS 3623, at *26 (N.D. Iowa 2009) (applying the *Fit Tech* definition of "classic arbitration"); *Wilbert, Inc.,* 2013 U.S. Dist. LEXIS at *5–6 (applying the *Fit Tech* definition of "classic arbitration").

19. Section 5.6 of the Operating Agreement does not meet the *Fit Tech* standard. Though Section 5.6 calls for disputes to be resolved by an independent Certified Public Accountant ("CPA"), and provides that the independent CPA's computation "shall be binding upon all the Members," (ECF No. 7.2 at § 5.6.), the Operating Agreement does not set forth any "substantive standards" such as procedural guidance for selecting the independent CPA, or the method by which the independent CPA will make a determination. *See Fit Tech, Inc.*, 374 F.3d at 7. Furthermore, the Operating Agreement does not state whether, or how, each side will have the "opportunity. . . to present its case." *Id.*

20. In contrast to the facts at issue in this case, the Honorable Judge Adam M. Conrad recently found that a contractual independent accounting process sufficiently resembled classic arbitration to constitute an arbitration process. *Post v.*

*Avita Drugs, LLC*, 2017 CVS 798 (Rowan County), Order on Motion to Compel Arbitration and to Stay, September 1, 2017 (Conrad, J.). In *Post*, the plaintiff formed MedExpress Pharmacy, Ltd. as a North Carolina corporation and owned the company with two other shareholders. *Id.* at p. 1. The plaintiff and the defendant, Avita Drugs, LLC, a Louisiana limited liability company, entered into a stock purchase agreement under which the defendant acquired all outstanding shares of common stock in MedExpress in exchange for a purchase price that included deferred payment of an Adjusted EBITDA.[1] *Id.* at p. 2. The stock purchase agreement provided a definition for the term "Adjusted EBITDA," the method of calculating the Adjusted EBITDA, and an agreement between the parties that an independent accountant would resolve any "impasse" between the parties regarding the amount of the Adjusted EBITDA (the "Independent Accounting Process"). *Id.*

21.    In *Post*, the court applied the standard from *Fit Tech* and held that the contractual Independent Accounting Process was arbitration. *Id.* at pp. 4–5. The court held that the Independent Accounting Process resembled classic arbitration because it was "binding and conclusive," on the parties, "require[d] the Independent Accountant to apply substantive standards," "establish[ed] procedural guidance, including, among other things, the process for selecting an independent adjudicator", and expressly "provid[ed] each side 'the opportunity to present'" evidence. *Id.* at p. 5.

---

[1]EBITDA stands for Earnings Before Interest, Tax, Depreciation and Amortization. EBITDA is "a measure of a company's operating performance….[C]alculate EBITDA by taking a company's net income and adding back interest, taxes, depreciation, and amortization." INVESTINGANSWERS, *Earnings Before Interest, Tax, Depreciation and Amortization (EBITDA)*, http://www.investinganswers.com/financial-dictionary/financial-statement-analysis/earnings-interest-tax-depreciation-and-amortizatio

22. In this case, the terms in Section 5.6 of the Operating Agreement do not sufficiently resemble classic arbitration to merit a finding that the parties agreed to arbitrate. Although the accounting process in Section 5.6 is binding on the parties, it provides that M&J will unilaterally select and engage the independent accountant, does not provide any substantive standards to be applied by the independent accountant, and does not provide any means by which the parties can present evidence in support of their respective positions. In fact, as written, it is not at all clear how the process works.

23. Even assuming, *arguendo,* that Section 5.6 is an arbitration agreement, Plaintiffs have not established that the disputes in this case are subject to Section 5.6. Plaintiffs appear to contend that any dispute involving M&J's accounting is subject to the dispute resolution process in Section 5.6. The language of Section 5.6, however, covers only disputes "with respect to the determination of the net cash flow, net losses or capital account balances of [M&J]." (ECF No. 7.2 at § 5.6.) Plaintiffs concede that Defendant primarily disputes "calculation of the law firm book value, prepaid client expenses, and the determination of the 2015 year end profits." (ECF No. 8 at p. 2.) None of these disputed calculations are expressly included among the specific accounting disputes subject to Section 5.6.

24. Plaintiffs do not contend that the entire dispute between the parties in this litigation can be decided by the process in Section 5.6. Section 5.6 is not designed, or well-suited, to resolve the factual and legal issues raised by the 16 separate claims in this lawsuit, including the accounting issues underlying some of the claims. Many

of Olson's claims involve allegations of unlawful manipulation of certain accounting figures in M&J's books. Resolution of such claims would involve presentation of expert testimony regarding whether certain accounting practices are proper and lawful, and potentially forensic accounting investigation to determine whether certain figures were manipulated and, if so, when such manipulation occurred. Section 5.6 provides no means by which the parties could present such evidence. Even if the Court were to compel arbitration pursuant to Section 5.6, the resulting determinations would be, at best, tangential to other important issues in this case. Judicial economy would not be served by such action.

25. Finally, Section 5.6 applies to disputes "among the Members." (ECF No. 7.2 at § 5.6.) Defendant argues that he is no longer a "Member" by virtue of his retirement, and is therefore not subject to mandatory dispute resolution under Section 5.6. (ECF No. 11 at pp. 19—20.) The language in the Operating Agreement indicates that, upon retirement, "Members" become "Retired/Former Members." (ECF No. 7.2 at "BACKGROUND STATEMENT" (referencing two attorneys who "retired from the Law Firm and [are] no longer…Member[s]"); § 12.4(c) (using the terms "retired member" and "former member" interchangeably).) For these reasons, the Court finds that Section 5.6 does not apply to the claims at issue here, or the Defendant as a Retired/Former Member of M&J.

26. Plaintiff requests that the Court stay these proceedings until the Section 5.6 dispute resolution process is complete. The Court does not find that Section 5.6

constitutes an arbitration agreement requiring a stay of the current proceedings. Plaintiffs' Motion to Stay should be DENIED.

THEREFORE, IT IS ORDERED that Plaintiff's Motion to Stay is DENIED.

This, the 25th day of September, 2017.

/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge
for Complex Business Cases