Cherokee South End, LLC v. PAP Invs. Scaleybark, LLC, 2018 NCBC 105.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

CHEROKEE SOUTH END, LLC,

        Plaintiff,

v.

PAP INVESTMENTS
SCALEYBARK, LLC; and
MOREHEAD TITLE
COMPANY/FIRST CHARLOTTE
ESCROW CORPORATION,

        Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18 CVS 11614

**ORDER AND OPINION ON
MOTION TO COMPEL ARBITRATION**

1. For nearly a decade, Plaintiff Cherokee South End, LLC ("Cherokee") and Defendant PAP Investments Scaleybark, LLC ("PAP") have developed real estate together through their jointly owned company, Scaleybark Partners, LLC. In 2017, PAP obtained an option to purchase Cherokee's membership interest in Scaleybark Partners and take full control of the company. According to Cherokee, PAP exercised the option but then failed to make the closing date, thus forfeiting a substantial deposit. Through this lawsuit, Cherokee seeks disbursement of the deposit.

2. PAP now contends that all claims asserted against it must be resolved in arbitration. For the reasons discussed below, the Court agrees.

*McGuireWoods LLP, by Irving M. Brenner and Alexander Covington, for Plaintiff Cherokee South End, LLC.*

*James, McElroy & Diehl, P.A., by Adam L. Ross and Christopher Thomas Hood, for Defendant PAP Investments Scaleybark, LLC.*

*No counsel appeared for Defendant Morehead Title Company/First Charlotte Escrow Corporation.*

Conrad, Judge.

## I.
## BACKGROUND*

3.     Scaleybark Partners was formed in 2007 for the purpose of developing real estate in Charlotte, North Carolina. (Compl. ¶ 13, ECF No. 3.) It was reorganized in 2009 to divide the membership interest between PAP and Cherokee. (*See* Countercl. ¶¶ 9, 10, ECF No. 11.) Then, in 2010, PAP and Cherokee executed the Second Amended and Restated Operating Agreement ("Operating Agreement"), setting out the terms governing the membership, management, and operation of Scaleybark Partners. (Countercl. ¶ 14; *see generally* Countercl. Ex. A ["Operating Agrmt."].)

4.     What happened next is less clear. The parties seem to agree that the tract of land owned by Scaleybark Partners was designated for mixed use, including affordable housing, commercial offices, retail stores, and access to public transportation. (*See* Compl. ¶ 14; Countercl. ¶ 8.) In its complaint, Cherokee goes no further, saying little about the effort to develop the property between 2009 and 2017. PAP, on the other hand, alleges that it was hard going: tax credits were denied, water and sewer access was unexpectedly limited, and disputes between PAP and Cherokee strained their working relationship with the City of Charlotte. (*See, e.g.*, Countercl. ¶¶ 15, 19, 25, 38.)

5.     Whatever the reason, it appears that the project reached a turning point by early 2017, when the parties entered into an Option to Redeem Agreement ("Option

---

* As context for the Court's analysis, this section describes the allegations in the complaint and counterclaims, along with the relevant facts regarding the pending motion, which are largely undisputed (though the parties draw different conclusions from them). The Court elects to make necessary findings of fact and conclusions of law at the end of this Opinion.

Agreement"). (Countercl. Ex. B ["Option Agrmt."].) PAP obtained the option to have Scaleybark Partners redeem Cherokee's membership interest. (*See* Compl. ¶ 16; Countercl. ¶¶ 25, 26; Option Agrmt. § 1.) As a practical matter, this gave PAP the ability to acquire full ownership of Scaleybark Partners (and, presumably, to extinguish any disputes over the direction of the company). (*See* Compl. ¶ 15.) If PAP did not exercise the option, or if it did but then failed to close, the roles would reverse: Cherokee would have the right to terminate the manager of Scaleybark Partners and then to purchase PAP's membership interest. (*See* Countercl. ¶ 27; Option Agrmt. § 13.) Until either party exercised its rights, though, the operation of Scaleybark Partners would continue as provided in the Operating Agreement. (*See* Option Agrmt. § 13.)

6. After pushing off the expiration date three times, PAP exercised its option in August 2017. (*See* Compl. ¶¶ 19, 20.) The Option Agreement required PAP to make an initial deposit of roughly ten percent of the total redemption price. (*See* Compl. ¶ 16.) Upon selecting Morehead Title Company as their escrow agent, the parties entered into an Escrow Agreement. (Compl. ¶¶ 20, 21.) PAP then paid the deposit, which the parties agreed would be nonrefundable except in the event of default by Cherokee. (Compl. ¶¶ 22, 23.)

7. Over the next few months, the parties agreed to extend the closing deadline twice, eventually settling on December 18, 2017. (Compl. ¶ 24.) But the closing did not take place. Cherokee alleges that PAP was unable or unwilling to pay the redemption price (nearly $8 million); PAP responds that it was unable to close due to

uncertainties caused by the City of Charlotte. (*Compare* Compl. ¶ 26, *with* Countercl. ¶ 43.)

8. Months went by. PAP alleges that it continued to work toward finalizing a deal with the City of Charlotte and moving the development forward. (*See* Countercl. ¶¶ 44–49.) In May 2018, though, Cherokee requested that Morehead Title release the escrowed deposit, allegedly as provided for in the Option Agreement. (*See* Compl. ¶ 28.) PAP responded by informing Morehead Title that the disposition of the funds was disputed and instructing it not to disburse them. (*See* Compl. ¶ 29; Countercl. ¶ 51.) Morehead Title has not released the deposit. (Compl. ¶ 31.)

9. Having received nothing, Cherokee terminated the manager of Scaleybark Partners and then filed this suit against both PAP and Morehead Title. (*See* Countercl. ¶ 53.) Cherokee seeks a declaration that it is entitled to the deposit and asserts that PAP breached the Option and Escrow Agreements by instructing Morehead Title not to release the funds. (Compl. ¶¶ 33–35, 39.) PAP has responded with counterclaims for unjust enrichment and breach of the duties of good faith and fair dealing. (Countercl. pp. 15–17.) Morehead Title has not yet answered or otherwise made an appearance.

10. As part of its responsive pleading, PAP has also moved to compel arbitration of all claims. (ECF No. 11 at 1–2.) PAP relies on the Operating Agreement, which includes an arbitration clause stating that "[a]ny dispute arising out of or in connection with this Agreement or the breach thereof shall be decided by arbitration . . . in accordance with the then prevailing commercial arbitration rules

of the American Arbitration Association ['AAA']." (Operating Agrmt. § 14.7.) PAP contends that this language is broad enough to cover Cherokee's claims to recover the deposit but that, in any event, any dispute over the clause's scope must be decided by the arbitrator under the AAA's rules. (*See* PAP's Br. in Supp. 1–2, ECF No. 12 ["PAP's Br."].)

11. Cherokee opposes the motion on the ground that its claims arise out of the Option Agreement and the Escrow Agreement, neither of which includes an arbitration clause. (*See* Pl.'s Resp. in Opp'n 7–8, 11–12, ECF No. 15 ["Opp'n"].) From Cherokee's perspective, the Operating Agreement and its arbitration clause are therefore both irrelevant. Cherokee also argues that the Option Agreement has a merger clause that supersedes any prior agreements, including the agreement to arbitrate in the Operating Agreement. (*See* Opp'n 8.)

12. The motion has been fully briefed, and the Court held a hearing on October 2, 2018. The motion is ripe for determination.

## II.
## ANALYSIS

13. Before addressing the merits of a motion to compel arbitration, a trial court must first decide whether to apply the Federal Arbitration Act ("FAA") or the North Carolina Revised Uniform Arbitration Act ("North Carolina Act"). *See, e.g., Epic Games, Inc. v. Murphy-Johnson*, 247 N.C. App. 54, 60–61, 785 S.E.2d 137, 142 (2016). Both parties agree that the choice likely makes no difference here. (*See* PAP's Br. 10; Opp'n 5.) But the answer is clear enough that avoiding the issue would serve little purpose. The FAA applies only to transactions involving interstate commerce. *See*

*Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 273–81 (1995). This dispute, though, is entirely local: Cherokee and PAP are both based in North Carolina, and the relevant contracts concern the ownership of Scaleybark Partners (another North Carolina company) and its operations (developing North Carolina real estate). Thus, the North Carolina Act applies.

14.     On the merits, the Court must determine, first, whether there is a valid arbitration agreement and, second, whether the dispute falls within the scope of that agreement. *See, e.g.*, *Ellison v. Alexander*, 207 N.C. App. 401, 404, 700 S.E.2d 102, 105–06 (2010). It is undisputed that section 14.7 of the Operating Agreement is a valid agreement to arbitrate. Thus, the question before the Court is whether the asserted claims fall within its scope—that is, whether the claims are arbitrable. The parties dispute not only the answer to that question but also *who* should decide it, the Court or the arbitrator.

15.     The usual rule is that courts must decide questions of substantive arbitrability (as opposed to questions of procedural arbitrability, such as timeliness). *See, e.g., T.M.C.S., Inc. v. Marco Contractors, Inc.*, 244 N.C. App. 330, 336, 780 S.E.2d 588, 593 (2015). But "parties can, and often do, delegate arbitrability to the arbitrator." *Charlotte Student Hous. DST v. Choate Constr. Co.*, 2018 NCBC LEXIS 88, at *8 (N.C. Super. Ct. Aug. 24, 2018). Under federal law, evidence of the parties' intent to arbitrate arbitrability must be clear and unmistakable; the standard under the North Carolina Act is less exacting. *See Epic Games*, 247 N.C. App. at 63, 785

S.E.2d at 144; *AP Atl., Inc. v. Crescent Univ. City Venture, LLC,* 2016 NCBC LEXIS 58, at *14 (N.C. Super. Ct. July 28, 2016).

16. Here, the parties clearly delegated arbitrability to the arbitrator by incorporating the AAA's Commercial Arbitration Rules within the Operating Agreement. These rules state that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." AAA, Commercial Arbitration Rules and Mediation Procedures, Rule 7(a) (Oct. 1, 2013). Our Court of Appeals (joining virtually every federal court of appeals) has held that an agreement incorporating this rule is an agreement "to arbitrate issues of substantive arbitrability." *Epic Games*, 247 N.C. App. at 63, 785 S.E.2d at 144; *see also Oracle Am., Inc. v. Myriad Grp., A.G.*, 724 F.3d 1069, 1074 (9th Cir. 2013); *Hall v. Dancy*, 2018 NCBC LEXIS 63, at *6–7 (N.C. Super. Ct. June 27, 2018).

17. With that, the Court has done its part, and the baton passes to the arbitrator. All of Cherokee's arguments go to questions of arbitrability reserved for the arbitrator. Cherokee argues, for example, that its claims are not arbitrable under the Operating Agreement because they arise solely out of the Option and Escrow Agreements, which do not have arbitration clauses. (*See* Opp'n 6.) As PAP correctly observes, though, it is up to the arbitrator to decide "whether the parties' dispute is within the scope of the Operating Agreement's arbitration provision." (PAP's Br. 12.)

18.     Cherokee also argues that the Option and Escrow Agreements superseded the Operating Agreement.  (*See* Opp'n 8, 11.)  In support, Cherokee relies on the Option Agreement's merger clause (which states that it "supersedes any prior understandings or agreements") and the Escrow Agreement's choice-of-law provision (which states that the parties "irrevocably consent" to the "jurisdiction" of North Carolina).  (Option Agrmt. § 17(f); Opp'n Ex. B § 3.7.)  This, too, is a question for the arbitrator.  When the parties have agreed to arbitrate arbitrability, as they have here, the arbitrator must decide whether the arbitration clause has been superseded or remains operative.  *See U.S. Nutraceuticals, LLC v. Cyanotech Corp.*, 769 F.3d 1308, 1311–12 (11th Cir. 2014) (holding that, when arbitration clause incorporated AAA rules, arbitrator must decide which of two contracts governed); *see also Cochrane v. Open Text Corp.*, 2015 U.S. Dist. LEXIS 78006, at *8–10 (N.D. Cal. June 16, 2015); *Adam Techs. Int'l S.A. de C.V. v. Sutherland Global Servs., Inc.*, 2011 U.S. Dist. LEXIS 160155, at *4 (N.D. Tex. May 26, 2011); *Viets v. Arthur Andersen LLP*, 2003 U.S. Dist. LEXIS 11377, at *18–22 (S.D. Ind. June 26, 2003).

19.     To be sure, there may be circumstances in which it is so clear that a claim is not arbitrable that it would seem pointless to compel arbitration.  Indeed, some federal cases hold that trial courts should refuse to send frivolous or "wholly groundless" issues of arbitrability to the arbitrator.  *E.g.*, *Archer & White Sales, Inc. v. Henry Schein, Inc.*, 878 F.3d 488, 495 (5th Cir. 2017), *cert. granted* 86 U.S.L.W. 3640 (U.S. June 25, 2018) (No. 17-1272); *but see Jones v. Waffle House, Inc.*, 866 F.3d 1257, 1268–69 (11th Cir. 2017) (rejecting "wholly groundless" exception).  The Court

need not decide whether North Carolina law includes such an exception, though, because Cherokee does not cite this line of cases and because PAP's assertion of arbitrability is not wholly groundless.

20. The parties' arbitration clause covers "any dispute arising out of or *in connection with*" the Operating Agreement. (Operating Agrmt. § 14.7 (emphasis added).) Courts have construed similar language broadly to include disputes having "a significant relationship" to the contract, regardless of how the plaintiff frames the dispute. *Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 93 (4th Cir. 1996). Here, Cherokee asserts claims against PAP for breach of the Option Agreement and the related Escrow Agreement, not the Operating Agreement. But the Option Agreement refers to the Operating Agreement and affirms the rights of both parties under it. (*See* Option Agrmt. § 13; *see also* Opp'n Ex. B § 1.2.) In addition, the parties' dispute implicates changes to the ownership and operation of Scaleybark Partners, which are governed by the Operating Agreement. It is not wholly groundless for PAP to contend that these claims arise "in connection with" the Operating Agreement. Whether they do, in fact, fall within the scope of the agreement is a question for the arbitrator, not for this Court. *See, e.g.*, *Worldwide Ins. Network, Inc. v. Messer Fin. Grp., Inc.*, 2018 NCBC LEXIS 103, at *10 (N.C. Super. Ct. Oct. 2, 2018).

21. Cherokee's assertion that the Operating Agreement was superseded is also debatable. Neither the Option Agreement nor the Escrow Agreement directly refers to arbitration. The Option Agreement does state, though, that Scaleybark Partners

"shall continue to be managed in accordance with the Operating Agreement and this Agreement does not alter the rights of the members or manager." (Option Agrmt. § 13.) One of those rights, PAP argues, is the right to arbitrate. In addition, although Cherokee relies on the Option Agreement's merger clause and the Escrow Agreement's choice-of-law provision, some courts have construed similar language not to conflict with an earlier arbitration agreement. *See, e.g.*, *UBS Fin. Servs., Inc. v. Carilion Clinic*, 706 F.3d 319, 328–29 (4th Cir. 2013); *Bank Julius Baer & Co. v. Waxfield Ltd.*, 424 F.3d 278, 284 (2d. Cir. 2005). PAP's argument that the Operating Agreement governs is not wholly groundless, and it is up to the arbitrator to evaluate the persuasiveness of the parties' positions.

22. In short, the parties chose to delegate questions of substantive arbitrability to the arbitrator, and the claims asserted against PAP must be submitted to arbitration. Having reached this conclusion, the Court also elects, in its discretion, to stay all claims and counterclaims pending completion of the arbitration. *See* N.C. Gen. Stat. § 1-569.7(g) ("If the court orders arbitration, the court on just terms shall stay any judicial proceeding that involves a claim subject to the arbitration.").

III.
CONCLUSION

23. The Court **FINDS** and **CONCLUDES** that the Operating Agreement contains a valid arbitration agreement subject to the North Carolina Act. Cherokee and PAP clearly and unmistakably delegated questions of substantive arbitrability to the arbitrator in the Operating Agreement, and the arbitrator must decide any arbitrability disputes as to the claims against PAP.

24.	For these reasons, the Court **GRANTS** the motion to compel arbitration and **ORDERS** all claims asserted against PAP to arbitration.  The Court **STAYS** further proceedings on all claims, including any counterclaims and any claims asserted against Morehead Title, pending resolution of the arbitration.  To the extent PAP seeks dismissal of the claims asserted against it, as opposed to a stay, that request is **DENIED**.

25.	The Court further **ORDERS** that the parties shall notify the Court of the arbitrator's decision as to arbitrability within seven days after the decision has been issued.


This the 12th day of October, 2018.


 /s/ Adam M. Conrad

Adam M. Conrad
Special Superior Court Judge
 for Complex Business Cases
